DETERMINED IN THE

# COURT OF ERRORS AND APPEALS

OF THE

## STATE OF NEW JERSEY,

## AT NOVEMBER TERM, 1876.

---

DAVID HUTTON ET UX., PLAINTIFFS IN ERROR, v. THE CITY OF CAMDEN, DEFENDANT IN ERROR.

1. The action of a board of health, finding that a nuisance exists on a person's property, such finding being in the absence of such person, and without notice to him, is void, even when it comes collaterally in question.
2. The question whether a nuisance exists, cannot be settled conclusively, except in a regular course of law, before the established courts of law or equity.

In error to the Camden Circuit Court.

For the plaintiffs in error, *D. J. Pancoast.*

For the defendant in error, *A. Hugg.*

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE. By the charter of the city of Camden, the common council is authorized to establish a board

of health, and to define its powers and duties. The same branch of the municipal government has, likewise, a further power, which is conferred upon it in these words, viz.: "To abate or remove nuisances of every kind, at the expense of those maintaining the same, and to compel the owner or occupant of any lot, house, building, shed, cellar, or place wherein may be carried on any business or calling, or in or upon which there may exist any matter or thing which is or may be detrimental, in the opinion of the sanitary committee or board of health appointed or established by the said city council, to the health of the inhabitants of the city, to cleanse, remove, or abate the same, from time to time, under the direction of the city council, as often as the said sanitary committee or board of health may deem necessary for the health of the inhabitants of the city, or, in a summary manner, to cause the same to be done at the expense and proper cost of such owner or occupant, and such owner or occupant is hereby expressly made liable for the costs and expenses, to be collected in such manner as the city council may by ordinance direct, from such owner or occupant," &c.

Under this gift of power, the city council passed an ordinance establishing a board of health, to consist of five members, by which it was ordained, "that whenever the board of health shall deem it advisable for the public health of the said city, and for the comfort and convenience of the inhabitants thereof, forthwith to abate or remove any nuisance in the said city, they are hereby authorized and directed to cause the same to be abated and removed without delay, at the proper expense and cost of the owner or occupant of the lot or premises upon which the same exists." In a subsequent section, the clerk of the board of health is directed to report to the city solicitor the name of the lot-owner, and the cost of the abatement of any nuisance; and in case of refusal to pay such expenses, for ten days, suit is authorized.

From an inspection of the bill of exceptions, it appears that, at a meeting of the board of health on the 29th of December, 1874, the following resolution was passed, to wit:

"Moffet moved that the lot of Mr. Hutton, on Federal street, above Broadway, be declared a nuisance, and he (Hutton) be notified to fill said lot up to grade. Agreed to."

On the 7th of the following January the following notice was served : "Mr. D. W. J. and Mary Hutton—You are hereby notified by the board of health of the city of Camden, to fill up to grade your lot, situated on Federal street, forty feet, southeast corner Broadway and Federal street, within ten days from date." This order not being complied with, the city did the work, at a cost of $213.30, and this suit was brought by the city to obtain reimbursement for this outlay, from the plaintiffs in error.

The bill of exceptions, likewise, disclosed the grounds upon which this action of the board of health was based. The owner of the property adjoining that of the plaintiffs in error, made complaint of the condition of the premises in question, and two members of the board paid it a visit. They acted in this separately, and one of them thus states what he did : "After looking at the lot, I made up my mind that it was a nuisance; if not then, it would be in wet weather; I found the lot in its natural state, with nothing put upon it by the hand of man—no erection on it; the lot towards Fredericks' house (Fredericks was the neighbor making the complaint) had been filled up for some eight or ten feet; I simply mean to say that the lot was lower in the middle than on the sides; I don't say how it became so; I saw no evidence of man's work there; I found no water on it; I made up my mind it was a nuisance, from the cases I knew about; it was from nothing that Hutton had done to the lot that it was declared to be a nuisance; the family of Fredericks were troubled by this lot; they told me about it; they said they had a very wet cellar; they also complained of the unhealthy condition of their own property; no other persons ever made complaint about the lot; I did not call on Hutton about the matter; the committee never notified them of their action in the matter; we never called on any of the neighbors to learn what they had to say about the lot;

I don't know much about that neighborhood; I am an eighth warder."

The second member of the board who made a view, testified in these words, viz.:

" I have been a member of the Camden city council; was present as a member of the board of health, at a meeting on December 29th, 1874, composed of Bourquin, Rogers, Wood and myself; the majority of us agreed that Hutton's lot was a nuisance, and we ordered the clerk to notify Hutton to abate 'the nuisance."

And being cross-examined, testified: " Bourquin, our chairman, opposed this action, and thought it was not a nuisance; we had two meetings about it; I can't remember their dates; our attention was first drawn to the lot by Fredericks' family; I mean Fredericks himself; I can't say when he saw me about it; no other complaint was ever made about the lot; I don't remember that any petition was presented to us to have this lot declared a nuisance; at the first meeting, a suggestion was made that the lot be visited, and that it be considered at another meeting; no definite action was had at the first meeting; no evidence was laid before us at the first meeting; I went to see the premises alone, between the two meetings; I went to Fredericks' house to see the lot; I saw water and ice there upon it; this was in mid-winter of 1875; I presume the water was two feet deep; it was a stormy time when I visited it—had been storming some days; I did not test the purity of the water; I just viewed the lot from the fence; I can't form any idea of the size of the pool of water I saw there; I was not on the lot at all; I judged from eyesight, only, about the depth of the water; I saw nothing else there, detrimental to public health, than rain-water and ice in it; the ground was full of frost at the time; that was the only time I ever visited the lot; Fredericks wanted the nuisance abated; I never before visited a lot under such conditions, with a view of declaring it a nuisance; I formed my judgment that it was a nuisance, from what I saw on that occasion; we sent Hutton no notice that we were deliberating

about declaring his lot a nuisance; we did not send him any word about our proceedings, until we declared the lot to be a nuisance, and ordered it to be abated."

The above testimony was elicited on the case made by the plaintiffs' witnesses, and there being no other evidence as to the fact of nuisance, on the case being rested, a motion to non-suit was made. This being overruled, the defendants offered to show, affirmatively, that there was no condition of their lot constituting a nuisance, and that they had never received any notice of the proceedings before the board of health. This offer was likewise rejected.

From the history of the proceedings, it appears that the before-cited resolution of the board of health was regarded, and was adjudged at the trial, to be absolutely conclusive of the question embraced in its decision. The board had agreed to the proposition that the lot of the plaintiffs was a nuisance, and that ended the matter, for all the purposes of the suit then trying. The resolution was looked upon as a judgment that was just as final as would have been the judgment of the Supreme Court of the state. It mattered nothing that the person whom the resolution was to affect, had not been notified of the action about to be taken affecting his interest, and had, therefore, no opportunity of being heard; nor that it affirmatively appeared, on the plaintiffs' own case, that no public nuisance, in point of fact, had existed on the property in question; or that a body of five persons had pronounced judgment, without evidence, on the representation of two of its members; or that such board had pronounced the lot itself to be a nuisance, without specifying in what respect, so as to enable the owner to remove whatever was objectionable; or that the order, instead of being to abate a designated nuisance, leaving it to the lot-owner to abate it in his own fashion, had directed the lot to be filled in to grade —yet, notwithstanding all these omissions and errors, which were obviously so flagrant as to leave in the action of this tribunal not the faintest semblance, either in form or substance, of a proceeding in an ordinary court of justice, was

pronounced to be, in point of law, final, and to import absolute verity.

But this view of the efficacy to be given to this decision of the board of health, even if such board is to be regarded as a special tribunal, authorized by the legislature to pass upon the matter adjudged by it, is, I think, manifestly erroneous. It is not within the competence of legislation in this state, to authorize any tribunal to render a judgment against the person or property of a citizen without a notice, and an opportunity afforded to him to be heard. If the charter of the city of Camden had declared that the board of health should have the power of rendering decisions similar to the present one, and under the same conditions of procedure, such provision would have been entirely nugatory. A judgment in any court, without in anywise summoning the defendant, would be void, and not merely voidable. It is true, that where the proceeding is in any of our domestic tribunals, whose action is regulated by the common law, it will not be admissible to show the fact, in a collateral way, that the sentence was rendered against a defendant who was not duly in court, the rule, introduced from the civil law, being, "*res judicata pro veritate accipitur.*" And this estoppel springs from the circumstance that in courts so constituted, there is a remedy provided against errors of every description. But this rule, which this conclusively presumes, that courts of this character had jurisdiction by means of due citation, over the person of the suitor, does not apply to inferior and special tribunals not being courts of record, and whose methods of action are not in accordance with those of the common law. Whenever the act of such a judicial body comes in question, its jurisdiction over the particular case adjudged is a mere matter *in pais*, and is open to inquiry by evidence. Such is the law, even in its application to judgments of the highest courts of other states, when sued upon in this state. *Moulin* v. *Insurance Co.*, 4 *Zab.* 222. And the principle was strongly emphasized in *Hess* v. *Cole*, reported in 3 *Zab.* 116, in which the point for decision was whether, in an action by

husband and wife for dower *unde nihil habet,* a plea that dower had already been assigned by the Orphans' Court, and in which proceeding process had been served on the wife, she living apart from her husband, was a good bar to the action. This plea was not sustained, on the ground that the husband had not been summoned, although the ground was taken that the judgment must be held to be conclusive in a collateral proceeding, Chief Justice Green saying, in the opinion read by him : " It is not enough, that the court have jurisdiction of the subject matter : they must also have jurisdiction of the person. In every proceeding of a judicial nature, it is essential that the person whose rights are to be affected should be a party to the proceeding, and have an opportunity of making defence." A number of cases are cited in this opinion, in support of the doctrine, and, in addition to these, the following may be referred to with advantage : *Cook* v. *Darling,* 18 *Pick.* 393 ; *Smith* v. *Rice,* 11 *Mass.* 507 ; *Fisher* v. *McGirr,* 1 *Gray* 1.

The result, then, on this head is, that even on the assumption that the power to adjudge the question of the existence of a nuisance in this case, was lodged in this sanitary board, it acquired no jurisdiction of the matter in this particular case, inasmuch as the party proceeded against was not offered an opportunity to make defence. Nor is it any objection to this conclusion to say that the power to adjudge in these cases, if given to this body at all, is given unqualifiedly, and without any requirement that there must be notice of the proceeding, for the power to adjudge, necessarily, by implication, carries with it the obligation to give a hearing to the person to be affected by the decision. This has been repeatedly adjudged in this state. *Youngs* v. *Overseers of Hardiston,* 2 *Green* 518 ; *Turnpike Co.* v. *Hall,* 2 *Harr.* 337.

This precise question, in the form in which it is now present, was recently passed upon, after a very full examination of the authorities, by the Supreme Court of Massachusetts. The case to which I refer is that of the *City of Salem* v. *Eastern R. R. Co.,* 98 *Mass.* 431. It was a suit simi-

lar to the present one, to recover the expenses of an abatement of a nuisance made by the city under the adjudication of a board of health. No opportunity to be heard had been given to the property owner, but still it was claimed that the decision of the board on the question of nuisance concluded him on the collateral proceeding to recover the money expended. To this position, the court made this reply : "But the court are of opinion that in a suit to recover expenses incurred in removing a nuisance, when prosecuted against a party on the ground that he caused the same, but who was not heard, and who had no opportunity of being heard before the board of health, such party is not concluded by the findings or adjudications of that board, and may contest all the facts upon which his liability is sought to be established."

Giving, therefore, to this resolution the utmost legal effect that can be ascribed to it, by conceding to the sanitary board a judicial capacity in the premises, still its action must be regarded as entirely void, inasmuch as it appears that it had not acquired jurisdiction over the plaintiffs in error. The proceeding was *coram non judice*, and as such, was not merely voidable, but was an absolute nullity.

But to rest here would be to put this matter on too narrow a ground. There is an infirmity in all proceedings of this nature, which lies deeper than the one just noticed. Assuming the power in this board derived from the legislature, to adjudge the fact of the existence of a nuisance, and also assuming such jurisdiction to have been regularly exercised, and upon notice to the parties interested, still, I think, it is obvious, that in a case such as that before this court, the finding of the sanitary board cannot operate, in any respect, as a judgment at law would, upon the rights involved. It will require but little reflection to satisfy any mind accustomed to judge by legal standards, of the truth of this remark. To fully estimate the character and extent of the power claimed, will conduct us to its instant rejection. The

authority to decide when a nuisance exists, is an authority to find facts, to estimate their force, and to apply rules of law to the case thus made. This is a judicial function, and it is a function applicable to a numerous class of important interests. The use of land and buildings, the enjoyment of water rights, the practice of many trades and occupations, and the business of manufacturing in particular localities, all fall, on some occasions, in important respects, within its sphere. To say to a man that he shall not use his property as he pleases, under certain conditions, is to deprive him, *pro tanto*, of the enjoyment of such property. To find conclusively against him, that a state of facts exists with respect to the use of his property, or the pursuit of his business, which subjects him to the condemnation of the law, is to affect his rights in a vital point. The next thing to depriving a man of his property, is to circumscribe him in its use, and the right to use property is as much under the protection of the law as the property itself, in any other aspect, is, and the one interest can no more be taken out of the hands of the ordinary tribunals than the other can. If a man's property cannot be taken away from him except upon trial by jury, or by the exercise of the right of eminent domain upon compensation made, neither can he, in any other mode, be limited in the use of it. The right to abate public nuisances, whether we regard it as existing in the municipalities, or in the community, or in the land of the individual, is a common law right, and is derived, in every instance of its exercise, from the same source—that of necessity. It is akin to the right of destroying property for the public safety, in case of the prevalence of a devastating fire or other controlling exigency. But the necessity must be present to justify the exercise of the right, and whether present or not, must be submitted to a jury under the guidance of a court. The finding of a sanitary committee, or of a municipal council, or of any other body of a similar kind, can have no effect whatever, for any purpose, upon the ultimate disposition of a matter of

this kind.　It cannot be used as evidence in any legal proceeding, for the end of establishing, finally, the fact of nuisance, and if it can be made testimony for any purpose, it would seem that it can be such only to show that the persons acting in pursuance of it were devoid of that malicious spirit which sometimes aggravates a trespass, and swells the damages.　I repeat that the question of nuisance can conclusively be decided, for all legal uses, by the established courts of law or equity alone, and that the resolutions of officers, or of boards organized by force of municipal charters, cannot, to any degree, control such decision.

Upon turning to the books, I do not discover that the precise point here considered has been directly presented in our own courts for judicial determination, but the view above expressed has obviously been acted upon in at least two decisions in proceedings in equity.　The first of these cases is that of the *Manhattan Manufacturing and Fertilizing Co.* v. *Van Keuren,* 8 *C. E. Green* 251.　The facts before the court were these : The complainants were manufacturing fertilizers, which, it was said, emitted offensive odors, so as to be a nuisance to the neighborhood.　The charter of Jersey City gives power to the board of aldermen to " declare what shall be nuisances in lots, streets," &c., and to provide for their removal.　By force of this authority, an ordinance was passed whereby " all slaughter-houses and other buildings whence offensive smells are emitted, are declared to be nuisances, and the street commissioner, upon complaint made, is empowered to enter upon any premises to ascertain if a nuisance exist, and, on ascertaining that it does, to give notice requiring its abatement within twenty-four hours, and if such notice be disregarded, to proceed to abate it.　By virtue of the right thus given, the commissioner had entered on the property of the complainant, and had decided that a nuisance existed, and, after notice, was proceeding to abate it.

The contention appears to have been made in this case, that the decision of the commissioner on the question was conclusive ; but the doctrine was emphatically repudiated, for

the Vice-Chancellor, in his opinion, says: "In the view I take of this case, the defendant acts at his peril. His own adjudication of the fact of a nuisance will not protect him, as would the judgment of a court." And in the second of the cases above referred to, which is that of *Weil* v. *Ricord*, 9 *C. E. Green* 169, a similar opinion on this subject, evidently is the groundwork on which the conclusion of the Chancellor is rested.

The expediency, if not absolute necessity, of the prevalence of the rule of law above sought to be vindicated, is conspicuously exhibited by the action taken under the city charter in the present case. The ignorant, hasty, and indiscreet conduct of this board of health, is an admonition not to be disregarded, against listening to any claim that, under any circumstances, the power of ultimate judgment over the law and facts with respect to the rights of persons or of property, can be safely confided to other hands than those of the ordinary judicial tribunals. As this case stands before this court, it appears that, without right, the city of Camden, through its officers, has entered upon the property of the plaintiffs in error, and, without their assent, altered its condition, and that this suit is brought to obtain re-payment of the costs of that trespass.

The judgment should be reversed.

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, DEPUE, DIXON, KNAPP, REED, SCUDDER, VAN SYCKEL, CLEMENT, DODD, GREEN, LATHROP, LILLY.     13.