103 N.J. Super. 61 (1968)
246 A.2d 521
ARAM AJAMIAN AND BERTHA HOFFMAN, PLAINTIFFS,
v.
THE TOWNSHIP OF NORTH BERGEN AND MILTON J. MUSS, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided August 30, 1968.
*64 Mr. Aram Ajamian, Pro se, and for plaintiff Bertha Hoffman.
Mr. Robert W. Bazzani, attorney for defendants.
LYNCH, J.S.C.
Plaintiffs Aram Ajamian and Bertha Hoffman[1], in the amended complaint filed in this action in *65 lieu of prerogative writ, allege that they are the "owners" of a tenement house known as No. 2525 Hudson Boulevard, in North Bergen Township, New Jersey. They seek a review of the action of defendant township, through defendant, Muss, its acting building inspector, when, on November 9, 1966, he served an order upon plaintiff Aram Ajamian directing that the said tenement house be vacated within a period of 24 hours for the reason that it was "unfit for human habitation or occupany." It is further alleged that pursuant to said order defendant township, through its officials, evicted the tenants from the building. No hearing was afforded plaintiff by defendant's officials.
Plaintiff claims that the action of defendants was illegal and unconstitutional because: (a) he was never afforded a hearing before their action in vacating the building and therefore was denied due process of law; (b) that under section 10 of the North Bergen Building Code and the National Building Code, which was adopted by defendant township, he was entitled to such a hearing; (c) the National Building Code applies only to buildings erected after its *66 adoption on February 16, 1966, and the subject building was constructed many years before, and (d) there were in fact no violations of any law or ordinance of defendant township.
Defendants' contentions may be summarized as follows: (a) plaintiffs are not the "owners" of the building in question; (b) the condition of the building, as revealed by several inspections by its various officials, was a "public nuisance" which, under the township's "police power," it had the right to abate summarily and without hearing; (c) since the National Building Code adopted by defendant (section 107) afforded plaintiffs an appeal to the board of appeal from any action of the building inspector, an opportunity for a hearing was thereby afforded, and since such appeal was not taken, any right to a hearing was waived, and (d) in any event, such a hearing has been afforded before this court, which heard the testimony of the several township officials who made the inspections of the building, as well as testimony on behalf of plaintiffs.
When the matter came on for trial, defendants persisted in their contention, as asserted in their answer, that plaintiffs were not "owners" of the property and therefore had no status to assert violation of rights herein. After the taking of some testimony the matter was adjourned to permit plaintiff Aram Ajamian to establish title. Finally, he conceded that Bertha Hoffman was not an owner of the property. Defendants produced a title searcher who testified that nowhere in the record title was Aram Ajamian revealed as an owner. The latter, however, made two alternative contentions. He said the property had been owned by his brother Harry Ajamian (whose name did not appear in the chain of title), who died intestate in 1954, leaving six sisters and brothers, of whom Aram was one. Therefore, it was said by plaintiff, he was the owner of a one-sixth interest by descent. Inconsistently and alternatively, he contended that he held several unrecorded deeds from the record owners and that he owned the property in his own name. He produced said deeds, dated at various times in the last several years, but on which *67 the acknowledgment, oddly, was taken on June 20 and 21, 1968, during the period in which the trial herein was interrupted, as above mentioned, to permit plaintiff to establish his ownership.
The proofs offered by plaintiff in support of his claim of title are not persuasive. However, for several years defendant township, in its efforts to correct the conditions existing in the building, had treated Aram Ajamian as owner, had filed a complaint in the municipal court against him wherein he was found guilty as owner and fined $100, and the notice to vacate of November 9, 1966 was served upon him. In addition, it is uncontradicted that Aram Ajamian has been acting at least as agent for the record owners and has collected the rents on the property for several years. The court therefore holds that defendant township is estopped to deny that plaintiff has sufficient status to prosecute this suit.
Evidence was taken before the court on four trial days. The testimony supports the following findings of facts, which are hereby made.
The premises involved consist of a six-family tenement house. The rents charged ranged from $90 per month for the basement apartment, to $125 per month for an apartment on the first floor, although there is some testimony by plaintiff Aram Ajamian that the rents were paid on a weekly basis. In any event, those rents approximated $615 per month.
On July 8, 1966 defendant Muss, then acting building inspector, accompanied by Health Officer Mc Closkey, Electrical Inspector Bruno and Plumbing Inspector Easton, examined the premises. The basement apartment, part of which had a concrete floor, smelled from human and animal waste, with droppings on the floor. A young girl was eating at a table on which roaches crawled. The toilet was covered with human excretion and the sink was taped "as though to stop a leak." As a photograph in evidence reveals, the metal ceiling in the kitchen was torn open in several places, exposing *68 the wooden lath beneath. Rat droppings were under the kitchen stove. This basement apartment was adjacent to the boiler room, which was filled with pieces of furniture, debris and wooden boxes. From it came the stench of "old human waste." The doorway from the boiler room to the apartment was propped up with a piece of wood. A metal fire door was jammed open and was not operable. In a "filthy" bed the mother of the family lay ill. The door from her bedroom to the hallway was missing, a blanket being stretched across the opening in its stead. This basement and its apartment may be described as "filthy," as the photographs in evidence reveal.
The building had many children in it. On the front stoop a wooden post holding up the roof was missing. If one leaned against the remnant of the column, the post would fall down upon anyone who might happen to be beneath it.
In the rear was a garage. Down to its roof came the fire escapes. The east face of the garage tilted out of plumb and eventually fell down. Its rear wall had been struck by cars, was also out of line, and had a good-sized crack in it. Later on, this was partially repaired. In the north alleyway the risers on the side stairs had broken away, rendering it unsafe to use.
In the "Morrison" apartment on the first floor (rent $125 per month) there was a leak over the kitchen sink and paint and paper peeled off the wall over the stove and sinks. In the bedroom the floor was rotted around the radiators, probably from water leaks. The ceilings were a "checkerboard" of cracks, all over. The toilet was "covered with excreta" and the smell from the basement permeated to this floor above.
On the stairway leading to the second floor the handrail of the bannister was broken, so that it was "shaky" if weight was put upon it. In place of rails the bannister, rope was woven back and forth, and as one moved on the steps he could feel them deflect under the weight.
*69 In the "McLaughlin" apartment on the second floor a section of the ceiling had come down over the kitchen sink, exposing three to four feet of wooden lath. The ceiling was still wet and part of it had "bellied."
The stairway to the third floor was "better" than that to the second. The fire escape ladder to the roof was "quite shaky." If a hand were put to it, it would vibrate but not fall down.
Electrical Inspector Bruno testified that 30-ampere fuses had been used in the meter board. They had "blown," indicating either a short circuit or overloaded circuit. These fuses were oversize. The risers to the apartments could carry only 15 amperes. Thus, the use of 30-ampere fuses allowed the overload, permitting the insulation in the wires to "bake to a crisp." "Zip chord" outlets were used, some loose and some nailed to the baseboards. They were frayed and, in some cases, their insulation was broken. Each apartment showed more appliance load than the wiring could carry on an overloaded fuse. At the cellar steps there was an open outlet box, with wiring exposed, which could be reached by any of the children in the building with possible fatal results. All of these conditions presented conditions hazardous to fire.
The foregoing conditions on July 8, 1966, described by Building Inspector Muss, were corroborated by the testimony of the Plumbing and Sanitary Inspector Easton and Bruno. After the inspection defendant township's officials conferred with plaintiff. He pleaded for time to correct the conditions. On July 8, 1966 Health Officer Mc Closkey, referring to "our oral agreement," wrote to plaintiff ordering him to vacate the basement and first-floor apartments as being in violation of the North Bergen Sanitary Code, article 13, section 4. This order was ignored. In August new inspections were made, but the conditions remained the same. On August 15, 1966 Inspector Muss wrote to plaintiff demanding that the building be vacated as "unfit for human habitation." This was not complied with. Another letter was sent by Muss on August 16, with particular reference to the garage wall *70 which he demanded be removed and rebuilt, and that the alley steps and front porch be repaired. Ultimately, the garage wall was repaired, but not rebuilt. Nothing appears to have been done to the alley steps. Through August other inspections were made. Conditions remained the same, but plaintiff asked for more time to take care of the building. Finally, a complaint was filed in the municipal court, returnable October 31, and plaintiff was fined $100. He asked for a permit to "repair" the garage. It was refused for two reasons: (a) "repair" was not sufficient, rebuilding was necessary (in a short time the garage collapsed), and (b) plaintiff was claiming that he was not the owner of the property but agent for Bertha Hoffman and, in Muss' words, she was a "phantom" whom plaintiff Ajamian never produced.
Finally, in November 1966 inspections revealed that conditions were substantially the same as they had been. But with the weather getting cold and the revelation that the heating system was not working, that the tenants were using their gas stoves to provide heat, and plaintiff's persistence in not correcting the unsanitary and unsafe conditions, the situation was emergent. Action was necessary. The notice to vacate was served on November 9, 1966 and the building was vacated. It is this action which plaintiff seeks to nullify here.
The court finds that this building, in the conditions described, constituted a "public nuisance." In Boden v. City of Milwaukee, 8 Wisc.2d 318, 99 N.W.2d 156 (Sup. Ct. 1959), such a nuisance was defined:
"We approve of the statement of the Florida supreme court, `It is generally recognized that anything which is detrimental to health or which threatens a danger to persons or property within the city may be retarded and dealt with by the municipal authorities.' City of Miami Beach v. Texas Co., 1940, 141 Fla. 616, 194 So. 368, 374, 128 A.L.R. 350. We also deem apposite the following declaration by a Texas court: `For a nuisance to be a public one, it need not affect the whole community; but it is public if injury or annoyance affect the people of some local neighborhood, or are occasioned to such part of the public as come in contact with it.' Stoughton v. *71 City of Ft. Worth, Tex. Civ. App. 1955, 277 S.W.2d 150, 153." (Emphasis added)
By N.J.S.A. 40:48-2.3 it is declared to be the policy of this State that the occupation of any building which is dangerous, unsafe, insanitary or otherwise unfit for human habitation is inimical to the welfare and injurious to the health and safety of the people of the State, and that public necessity exists for the closing of such a building.[2] This building was clearly detrimental to the health and safety of its occupants and to anyone who would come in contact with it, or might be within the area of exposure to its unsanitary condition.
Plaintiff offered in evidence section 10 of an ordinance adopted August 23, 1923, which purported to set forth the procedure required when the building inspector determined that a building was unsafe. As plaintiff points out, that section provides for a hearing before the township committee before an order to vacate may be made. Since it is conceded by defendants that no such hearing was granted, that ordinance may not be used as a basis to justify defendants' actions herein. Defendants also assert that they acted pursuant to the National Building Code, which was adopted by North Bergen in 1966, but that ordinance by its terms (section 100.3) limits its "scope" only to buildings "hereafter erected." Since the subject building was erected many years before 1966, it cannot be said that the National Building Code may be used as authority for the summary action taken herein. Nor can defendants rely on plaintiff's failure to appeal to the board of appeal, provided by section 107.6 of that code, as constituting a waiver of a right to a hearing.
*72 However, defendants contend that they had a common-law right to summarily abate the nuisance here present with or without statutory or ordinance authority. In any event, they point to R.S. 26:3-46, 47, 49 and 50, which, in substance, give a local board of health the power to abate such a nuisance as existed here, even without an ordinance. Lastly, they specifically refer to article 13, section 4 of the Sanitary Code, adopted January 16, 1923, which reads as follows:
"Sec. 4. Whenever it shall be decided by this Board that any building or part thereof is unfit for human habitation by reason of its being so infected with disease or by reason of its being in a condition dangerous to health or life or to be likely to cause sickness among the occupants, and notice of such decision shall have been affixed conspicuously on the building that it is unfit for human habitation and the owner shall have been served with the notice or the agent or lessee, in cause [sic] the owner cannot be found within the State, requiring that all persons therein shall vacate such building or part thereof, [sic] shall within ten days thereafter be vacated, or within such time as in said notice may be specified."
The latter section was specifically referred to in the notice of July 8, 1966, sent by Health Officer McCloskey to the plaintiff, wherein he was ordered to vacate the basement apartment and the entire first floor of the building.
The court finds that defendants had the authority to summarily vacate the building, both under the authority of R.S. 26:3-46, 47, 49 and 50, as well as article 13, section 4 of the Sanitary Code. It also finds that the right of summary abatement was warranted under the exercise of the common-law right to abate a public nuisance.
In vacating the subject premises defendants performed an act within "the police power." That power includes "everything essential to the public safety, health, and morals, and to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance." Lawton v. Steele, 152 U.S. 133, 136, 14 S.Ct. 499, 500, 38 L.Ed. 385 (1894); Thornton v. Chase, 175 *73 Misc. 748, 23 N.Y.S.2d 735 (Sup. Ct. 1940); 14 A.L.R.2d 74; 39 Am. Jur. Nuisances, § 184, p. 455.
As said in Weil v. Ricord, 24 N.J. Eq. 169 (Ch. 1873):
"Among the objects sought to be secured by municipal government, there is none more important than the preservation of the public health, and, therefore, the imperative obligation rests on the government of every city, promptly to abate or remove all nuisances by which the public health may be affected. It is no less its duty to provide, in like manner, for the comfort and convenience of the inhabitants within its limits. To these ends, such governments are clothed with police powers. These being among the powers which are of the most importance to the inhabitants, those by which the public peace, health, comfort, and convenience, and the general welfare are secured or promoted, are not only respected, but maintained by the courts, which, as a matter of public policy, will not interfere with or disturb municipal bodies in the legitimate exercise of those powers. It is only when those bodies transcend their limits, in that respect, that the aid of the courts can be successfully invoked to restrain them, or to visit upon them the injurious consequences of their acts. The necessities of the community oft-times require the promptest and most positive action. There are times when public health is the object of paramount concern, and the law wisely lodges in municipal bodies, the discretion and power adequate to such emergencies, a power and discretion whose existence is, at all times, necessary to secure the public health, comfort, and convenience." (at p. 173; emphasis added)
See also 62 C.J.S. Municipal Corporations, § 281.
The right to abate a public nuisance is a common-law right which preexisted the enactment of the Federal Constitution; hence it is not within the prohibition of the provisions of that instrument and exists in the absence of statute. 39 Am. Jur., Nuisances, § 183, p. 454; Manhattan Manufacturing and Fertilizing Co. v. Van Keuren, 23 N.J. Eq. 251 (Ch. 1872). In the latter case, it was said:
"At common law, it was always the right of a citizen, without official authority, to abate a public nuisance, and without waiting to have it adjudged such by a legal tribunal. His right to do so depended upon the fact of its being a nuisance. If he assumed to act upon his own adjudication that it was, and such adjudication was afterwards shown to be wrong, he was liable, as a wrong-doer, for his error, and appropriate damages could be recovered against *74 him. This common law right still exists in full force. Any citizen, acting either as an individual or as a public official under the orders of local or municipal authorities, whether such orders be or be not in pursuance of special legislation or chartered provisions, may abate what the common law deemed a public nuisance. In abating it property may be destroyed and the owner deprived of it without trial, without notice, and without compensation. Such destruction for the public safety or health, is not a taking of private property for public use, without compensation or due process of law, in the sense of the Constitution. It is simply the prevention of its noxious and unlawful use, and depends upon the principles that every man must so use his property as not to injure his neighbor, and that the safety of the public is the paramount law. These principles are legal maxims or axioms essential to the existence of regulated society. Written constitutions pre-suppose them, are subordinate to them, and cannot set them aside. They underlie and justify what is termed the police power of the state. By virtue of that power, numerous and onerous restrictions and burdens are imposed upon persons and property which, for other purposes or on other grounds, would be prohibited by the constitutional limitations sought to be applied in this suit. Cooley on Const. Lim. 572; Potter's Dwarris on Statutes 444." (at p. 255)
See also 39 Am. Jur. Nuisances, §§ 185, 185, 187, pp. 455, 457, 462; North American Cold Storage Co. v. City of Chicago, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908), and 14 A.L.R.2d 74.
In City of Miami Beach v. Texas Co., 141 Fla. 616, 194 So. 368 (Sup. Ct. 1940), where an ordinance authorized health officials to condemn a building as unfit, it was held that the effect of the ordinance was to declare the building a public nuisance. Cf. Boden v. City of Milwaukee, supra. Thus, where article 13, section 4 of the North Bergen Sanitary Code authorizes the closing of a building as being "unfit for human habitation by reason of its being so infected with disease or by reason of its being in a condition dangerous to health or life or to be likely to cause sickness among the occupants," it, too, declares a building within its terms a public nuisance. Such abatement for public safety or health is not a taking of private property for public use without compensation or due process of law, in the sense of the Constitution. It is simply the prevention of its noxious and *75 unlawful use and in that context the safety of the public is the paramount law. As said in the leading case of Health Department of City of New York v. Rector, &c. of Trinity Church, 145 N.Y. 32, 39 N.E. 833, 27 L.R.A. 710 (Ct. App. 1895):
"Laws and regulations of a police nature, though they may disturb the enjoyment of individual rights, are not unconstitutional, though no provision is made for compensation for such disturbances. They do not appropriate private property for public use, but simply regulate its use and enjoyment by the owner. If he suffers injury, it is either damnum absque injuria, or in the theory of the law, he is compensated for it by sharing in the general benefits which the regulations are intended and calculated to secure. 1 Dill. Mun. Corp. (4th Ed.) § 141, and note 2; Com. v. Alger, 7 Cush. 83, 84, 86; Baker v. City of Boston, 12 Pick. 184, 193; Clark v. Mayor, etc., 13 Barb. 32, 36. The state, or its agent in enforcing its mandate, takes no property of the citizen when it simply directs the making of these improvements." (at p. 836; emphasis added)
See also Manhattan Manufacturing and Fertilizing Co. v. Van Keuren and Thornton v. Chase, supra.
This is not to say that one whose property has been summarily taken, vacated or destroyed is not entitled to a hearing at some stage in the proceedings. Nor is it to to say that the determination of public officials that a building or its condition is a public nuisance is final and conclusive as to that fact so as to preclude a hearing to the property owner on that question. To ascribe to such determination the quality of conclusiveness or finality, without a hearing on the issue, is indeed a denial of due process of law. But no hearing is necessary, within the constitutional requirement of due process, if the determination of the officials is not held to be conclusive, and so long as a hearing is, at some time, afforded as to the fact vel non of nuisance. North American Cold Storage Co. v. City of Chicago, supra; Lawton v. Steele, supra; 39 Am. Jur., Nuisances, § 187, p. 462; Manhattan Manufacturing and Fertilizing Co. v. Van Keuren, supra, and Hutton v. City of Camden, 39 N.J.L. 122 (Err. & App. 1876).
*76 As said in City of Newburgh v. Park Filling Station, 273 App. Div. 24, 75 N.Y.S.2d 439 (App. Div. 1947):
"`Where property of an individual is to be condemned and abated as a nuisance, it must be that somewhere between the institution of the proceedings and the final result the owner shall be heard in the courts upon that question, or else that he shall have an opportunity, when calling upon those persons who destroyed his property to account for the same, to show that the alleged nuisance was not one in fact.' Health Department of City of New York v. Rector, etc., of Trinity Church, 145 N.Y. 32, 47, 48, 39 N.E. 833, 838, 27 L.R.A. 710, 45 Am. St. Rep. 579. It is sufficient to satisfy the constitutional safeguards of the owner, if he does not have a hearing in advance of the order, that he have the right to present his defense after the order is made. The Board has the power thus to act to protect the public health, without notice to the owner, even though there is no emergency requiring speedy action and though the Board has ample time in which to give notice to the owner and have a hearing on the question whether the nuisance exists. North American Cold Storage Co. v. City of Chicago, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195, 15 Ann. Cas. 276." (at p. 441; emphasis added)
By this action in lieu of prerogative writs, plaintiff is "calling upon" defendants, who vacated the property, "to account for the same." He has been afforded the opportunity in this court "to show that the alleged nuisance was not one in fact." Here he has had his hearing. The essential weakness in plaintiff's argument that he was entitled to a hearing before defendants vacated the building lies in his failure to recognize the distinction between those cases where "conclusiveness" or "finality" is claimed for the determination of the officials, and those where no such quality is ascribed to them. The distinction is well illustrated in the two New Jersey cases of Manhattan Manufacturing and Fertilizing Co. v. Van Keuren and Hutton v. City of Camden, supra. In the former case the court refused to enjoin the abatement of an alleged nuisance before a hearing but expressly stated that its action would not foreclose a later adjudication as to whether, in fact, a nuisance existed. As the court said:
"In the present case the complainants deny that their business or works are a nuisance. The defendant avers that they are, and *77 affidavits are offered on both sides in support of these assertions. In the view I take of the case, the defendant acts at his peril. His own adjudication of the fact of a nuisance will not protect him, as would the judgment of a court. It was said at the argument that actions had been commenced against him for the recovery of damages, and are now pending. It is unnecessary for me now, and in my judgment would be improper, to express an opinion upon the question to be determined in such actions. It is sufficient to say that the affidavits to show the offensive and noxious odors emitted and pervading at times the vicinity of the works, are numerous and explicit. They are sufficient to prove that the commissioner's conclusion as to the character of complainant's business and works, was not entirely without evidence to support it. The correctness of the conclusion is not now to be determined." (at p. 256; emphasis added)
In Hutton v. City of Camden, however, the plaintiff Camden contended that the determination of its board of health that a nuisance existed was conclusive and not subject to further judicial review. The city had sued the property owner for $213.30, the cost of abating the alleged nuisance. The lower court rejected proof offered by defendant that there was not a nuisance in fact. On appeal the Court of Errors and Appeals reversed, saying that the lower court considered the resolution of the health board as "absolutely conclusive"; that "that ended the matter," and that it was "in point of law, final, and to import absolute verity." The court distinguished Manhattan Manufacturing and Fertilizing Co. v. Van Keuren, pointing out that in that case "conclusiveness" was not ascribed to the official determination as to the fact of nuisance.
Plaintiff, however, claims that he was entitled to a hearing before the officials acted. In Egan v. Health Department, 20 Misc. 38, 45 N.Y.S. 325 (Sup. Ct. 1897), plaintiff was the owner of a tenement house. Defendant ordered that the tenants vacate the premises because the building was "unfit, and not reasonably capable of being made fit, for human habitation, by reason of want of proper ventilation, and by reason of want of repair and defects in the drainage and plumbing, and because of the existence of a nuisance on the premises which is likely to cause sickness among its *78 occupants, and that the occupancy of said building is dangerous to life and detrimental to health." The suit sought to enjoin the health department from enforcing its order. The court said, after trial: "The unsanitary condition of the building was obvious, the facts had been reported to the board by its officers who were charged with the duty of personal inspection, and at least two of the commissioners had themselves personally examined the property."
The court further said:
"The plaintiff contends, however, that she was entitled to notice of the proceedings, and to be heard upon the question before it was found against her, and that, as she had neither, she has been deprived of her property without due process of law, in violation of constitutional guaranty, and is therefore entitled to the protection of the court against an unwarrantable invasion of her right. This claim, however, is unsupported by authority. Health Dept. of City of New York v. Rector, etc., of Trinity Church, 145 N.Y. 32, 39 N.E. 833 [27 L.R.A. 710]; People [ex rel. Copcutt] v. Board of Health of City of Yonkers, 140 N.Y. 1, 35 N.E. 320 [23 L.R.A. 481]; Fire Dept. [of City of New York] v. Gilmour, 149 N.Y. 453, 459, 44 N.E. 177.
It rests upon the mistaken assumption that the determination of the health authorities is final and conclusive. The jurisdiction of the board depends upon the existence of the nuisance, and that is always open to judicial inquiry, even though the property owner may have had a hearing before the board on the subject. Health Dept. v. Rector, page 48, 145 N.Y., and page 848, 39 N.E., where the whole subject is elaborately discussed. Even the act under which the defendant proceeded in this case does not assume to do more than to declare that the orders of the health board are to be treated as `prima facie just and legal.' While the judgment of the board upon the question is entitled to great weight, and will not be disturbed if it is within the bounds of reason, its reasonableness is still open to inquiry in any judicial proceeding, either civil or criminal, in which it may be called in question. But where sufficient grounds exist for action, the latter may be summary and without `due process of law,' as that phrase is commonly understood. Lawton v. Steele, 119 N.Y. 226, 23 N.E. 878 [7 L.R.A. 134].
In the case cited the court, after reviewing the cases upon the subject, says (page 237, 119 N.Y., and page 880, 23 N.E.):
`These authorities sufficiently establish the proposition that the constitutional guaranty does not take away the common-law right of abatement of nuisances by summary proceedings without judicial trial or process.'

*79 * * * * * * * *
In other words, the deprivation of which the plaintiff complains continues only so long as the conditions exist which justified the order in the first instance, and the plaintiff, therefore, is not aggrieved, on constitutional or other grounds, by the operation of repressive measures essential to the abatement of the nuisance, for such repression can continue only so long as the occasion for it exists.

* * * * * * * *
The first step is the order such as was made in the first instance in this case. It is injunctive in form, and in contemplation of law suspends the occupation of the property while the grounds for complaint exist. The owner may remedy the evil, and when he shall have done so he will be relieved from the order. Should this not be done or be impossible, the board may follow up the first order by a second one, which by statute is predicated upon the former, declaring the mischief irremediable and condemning the building. Where the owner does not assent to the removal, the board must avail itself of the remedy by which the condemnation is legally accomplished, and the amount of compensation to be made to the property owner is ascertained, and in that proceeding the existence of the jurisdictional facts, namely, `the necessity of such destruction,' must be tried and determined on the demand of the owner.
We have thus, when the action of the board is to be conclusive upon the rights of the owner, ample provision for notice and a judicial hearing before such action becomes final; and, if the decision of the court is adverse to the board, the property owner is free from the operation of the second order, and, as we have seen, may disburden himself of the first by remedying whatever evils may justify its continuance. As the power conferred upon the board is necessary for the protection of the public health, and must, therefore, be susceptible of immediate and untrammeled exercise, as the exigency of the case may require, the statute is quite as considerate of private right as it should be, and fully meets the demands of justice. It is clearly constitutional, and the court will refrain from interfering with its operation except in cases where an abuse of authority is manifest." (at p. 326 et seq., emphasis added)
See also North American Cold Storage Co. v. City of Chicago, supra; Lawton v. Steele, supra; City of Salem v. Eastern Railroad Company, 98 Mass. 431 (Sup. Jud. Ct. 1868); City of Newburgh v. Park Filling Station, supra; Shedrick v. Board of Health of Consol. Dist., 204 Misc. 545, 121 N.Y.S.2d 83 (Sup. Ct. 1953). As said in City of Salem v. Eastern Railroad Company:
*80 "Although notice and opportunity to be heard upon matters affecting private interests ought always to be given when practicable, yet the nature and object of these proceedings are such that it is deemed to be most for the general good that such notice should not be essential to the right of the board of health to act for the public safety. Delay for the purpose of giving notice, involving the necessity either of public notice or of inquiry to ascertain who are the parties whose interests will be affected, and further delay for such hearings as the parties may think necessary for the protection of their interests, might defeat all beneficial results from an attempt to exercise the powers conferred upon boards of health." (at p. 443; emphasis added)
The court further held that:
"* * * in a suit to recover expenses incurred in removing a nuisance, when prosecuted against a party on the ground that he caused the same, but who was not heard, and had no opportunity to be heard, upon the questions before the board of health, such party is not concluded by the findings or adjudications of that board, and may contest all the facts upon which his liability is sought to be established." (at p. 447)
But the right to summarily abate a nuisance is not without limitations. The right is based upon necessity, and the necessity must be present to justify its exercise. 39 Am. Jur., Nuisances, § 184, pp. 455-7; State, Avis, Prosecutor v. Borough of Vineland, 56 N.J.L. 474 (Sup. Ct. 1894); Hutton v. City of Camden, supra. The remedy must be confined to what is necessary to abate the nuisance, and no more injury must be done to the rights of individuals than is necessary to accomplish the abatement. 39 Am. Jur., supra; 25 Am. Jur., Health, § 40, p. 317. Thus, had defendants here attempted to destroy this building, undoubtedly the threat would be enjoined pending a hearing, as was done in Vanderhoven v. City of Rahway, 120 N.J.L. 610 (Sup Ct. 1938) and Rosenberg v. Sheen, 77 N.J. Eq. 476 (Ch. 1910), which cases are cited by plaintiff in support of his argument. Defendants have, from the very beginning of this controversy, expressly abjured any intent to destroy the building.
*81 The limitations above mentioned are nothing more than the application of the rule of reason to officials' actions in abating a nuisance, considering the method employed and the nuisance to be abated. It is in that context that some decisions require that an "emergency" exist before summary abatement may be effected. What are the circumstances of the particular case and how drastic is the method which is employed to abate? In the case of a threatened destruction of a building the injury to the owner, if no nuisance in fact exists, is irreparable once the building is destroyed. That was the situation in Vanderhoven v. City of Rahway and Rosenberg v. Sheen, supra. In those cases there was no imminent, continuing threat to health or safety which required summary action. The "necessity" did not exist. Here unsanitary and unsafe conditions had persisted from July 8 to November 9, 1966. Every moment of continuous exposure of the occupants to the unsanitary conditions and to the hazards of fire constituted a danger to their health and safety. The method used  to vacate and remove the occupants from the risk  was reasonable and was not more than was necessary to accomplish the end sought.
Plaintiff had been given ample opportunity to correct the unsanitary and unsafe conditions existing in the building. Despite several notices to correct the conditions he remained adamant and did practically nothing. Finally he was charged and found guilty in the municipal court. The fact that defendants had been patient in seeking compliance did not remove the necessity to finally vacate the premises. Further delay would only compound the evil and might defeat the beneficial results of an attempt to save the occupants of the building from further exposure to the unsanitary and unsafe conditions existing as of November 9, 1966. See City of Salem v. Eastern Railroad Company, supra; 25 Am. Jur., Health, § 38, p. 315.
A direction by health authorities to correct conditions which constitute a nuisance is not a denial of due process. This is at least so when the requirement of the *82 order is not unreasonable. Health Department of City of New York v. Rector, &c. of Trinity Church, supra. "The improvement of work must, in itself, be a reasonable, proper, and fair exaction, when considered with reference to the object to be attained." Id., 39 N.E., at p. 836.
As said above, this is not a case wherein the defendants have ordered the destruction of plaintiff's building, as in Vanderhoven v. City of Rahway and Rosenberg v. Sheen, supra. Nor is it a case where defendants have absolutely prohibited plaintiff from the use and enjoyment of the premises, as, for example, in Weil v. Ricord, supra. As said in Manhattan Manufacturing and Fertilizing Co. v. Van Keuren, supra:
"It may be lawful to purge premises of a nuisance, and unlawful to burn or destroy them. How much force, or what kind, may be permissible in abating it, is obviously a different inquiry from the permissibility of any."
In Weil v. Ricord it was held that defendant authorities had a right to summarily abate a nuisance while the premises were being conducted as such, but that they had no right to "absolutely prohibit" future use of the premises when the business therein conducted was not in fact a nuisance. In those cases where complete destruction of the building is ordered or absolute prohibition of future use is ordered there results irreparable harm against which equity would grant an injunction. Weil v. Ricord is authority for the proposition that where interruptions of a business are "reasonably necessary to enable [the authorities] to abate any nuisance," such reasonable interruptions may be accomplished in a summary fashion without notice or hearing. All plaintiff had to do here to regain the use and financial avails of this tenement house was to comply with directions of defendant authorities by correcting the conditions which the court here finds to have been in fact a nuisance. That is an interruption reasonably necessary to abate the nuisance for the time. Much like a person who is in civil contempt, plaintiff *83 here had "the keys in his own pocket." The abatement here effected by vacating the building thus was not a "taking" without due process. It was simply the prevention of its unlawful and noxious use. Manhattan Manufacturing and Fertilizing Co. v. Van Keuren; Health Department of City of New York v. Rector, &c. of Trinity Church, and Thornton v. Chase, supra. The deprivation of which plaintiff complains continues only so long as the conditions exist. He may remedy the conditions, or not. If upon trial it were to be proved that the place was not in fact a nuisance, defendants, having acted summarily at their peril, would be held responsible. This court has determined that the subject building, in the condition described, was in fact a public nuisance, and the defendants' actions were justified.
Judgment for defendants.
NOTES
[1] Plaintiff, Aram Ajamian, is an attorney of the State of New York, but not of New Jersey. He has appeared pro se and, with permission of the court, has appeared as attorney for plaintiff Bertha Hoffman. This circumstance has tended to obscure plaintiff's factual and legal arguments as he has attempted to prosecute this action under New Jersey law and procedure. The original complaint herein was filed on December 7, 1966, and was so prolix and obscure that it was stricken by the court pursuant to a letter opinion dated December 29, 1966. In that opinion the court gave plaintiffs leave to file an amended complaint within ten days thereafter and specifically pointed out, by way of advice, the elements which should be alleged in the amended complaint. At the same time plaintiffs were given leave, upon filing of the verified amended complaint, to renew their application for ad interim relief. They failed to do so for the reason, as asserted in plaintiffs' trial brief, that they were under the impression that an amicable adjustment had been made between them and the building inspector. In any event, an amended complaint was filed, but since plaintiffs did not renew their application for ad interim relief, this court was unaware of its filing and it was not brought to the court's attention until the matter, in the ordinary course, was noticed for pretrial on May 10, 1968. The amended complaint is scarcely an improvement over the original complaint in terms of clarification of issues. In any event, the pretrial order was dictated by the court in an effort to accomplish that end. At trial it was conceded that Bertha Hoffman has no interest in the property and as to her the complaint was dismissed. Reference to "plaintiff," therefore, is to Aram Ajamian. As to his status, see below.
[2] While it is true that the statute provides for a hearing before such a building may be vacated, it also provides, by N.J.S.A. 40:48-2.11, that the statute does not impair any existing powers to prevent violations thereof, but is in addition and supplemental to any powers conferred by any other law.