149 N.J. Super. 416 (1977)
373 A.2d 1045
EXPO, INC., A CORPORATION OF THE STATE OF NEW JERSEY, T/A THE TOP TOMATO, PLAINTIFF,
v.
CITY OF PASSAIC ET AL, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided April 6, 1977.
*418 Mr. Michael A. Konopka for plaintiff.
Mr. Steven E. Pollan for defendant.
CONN, J.D.C., temporarily assigned.
In this proceeding in lieu of prerogative writs brought by the operator of a go-go dancing establishment in Passaic, New Jersey, against the city and various officials, a host of issues have developed. *419 Most have been disposed of by determinations from the bench; several require a more detailed exposition. These include the viability of a local obscenity ordinance and whether local action in closing down plaintiff's business prior to hearing is immune from attack.
Plaintiff, trading as Top Tomato, operates what is commonly known as a "juice bar." It has no liquor license and thus is limited to the sale of nonalcoholic beverages. There is an admission charge which entitles patrons to view groups of girls performing on a small stage.
The suit was commenced by order to show cause dated December 17, 1976. Plaintiff requested a temporary restraining order against defendant municipality preventing it from interfering with the operation of its business. Defendant had previously closed the establishment by revoking its Certificate of occupancy. Plaintiff sought a judgment for damages, a permanent injunction and a declaration that certain municipal ordinances were ultra vires and void.
A temporary restraining order was granted by the court on January 12, 1977 allowing plaintiff to reopen. A municipal court hearing on the revocation of the certificate of occupancy without a prior hearing and whether the conduct at plaintiff's establishment was obscene was ordered to proceed. This court retained jurisdiction on the constitutionality and preemption issues involving the municipal ordinance and the damage claim.
As a result of a finding of guilt of obscenity at the municipal level, the plaintiff appealed and the city moved to lift the restraints.
The city's application was denied but a limiting order was entered, specifying prohibited conduct. That latter proceeding brought home to the court the difficulty of fact-finding with regard to "live" performances. To stage a performance for the court would be futile. Certainly the performances would be geared to the ambiance of the courtroom. The taking of testimony afforded scant hope that the true picture of the performances would shine through. An unannounced *420 trip to Top Tomato by the court would have caused no end of problems. The court thus followed a procedure used by federal District Court Judge Mitchell Cohen in Starshock v. Shusted, 370 F. Supp. 506 (D.N.J. 1974), rev'd 493 F.2d 1401 (3 Cir.1974): law clerks were assigned to view, unannounced, the plaintiff performances as well as performances at nearby go-go shows in liquor dispensing establishments. (One of plaintiff's contentions was that Passaic had dozens of go-go shows in taverns that were identical in content to plaintiff's but were free from city interference. Plaintiff claimed selective prosecution.) Affidavits of the law clerks visits were submitted to opposing counsel before the appeal, thus obviating the problem that arose in Starshock, supra.
The court heard the municipal appeal on the record below and concluded the performances were obscene.
A detailing of the various plaintiff performances as indicated in the transcript of the municipal court proceedings and the law clerk affidavits is unnecessary. Suffice it to say that the combination of scant attire (pasties, G-strings, shoes), the proximity of performers to the patrons sitting at the end of the stage, and the various gyrations and wiggling of the girls in prone or "horizontal" positions on or next to the stage floor  amounts to nothing less than the purposeful and lewd exhibition of genitalia and the simulation of sexual acts. As stated in Starshock v. Shusted, supra (also a nonliquor selling go-go cabaret) it is clearly the exploitation of human sexuality for commercial purposes. The court is also satisfied that the performances appeal to the prurient interest and are without a modicum, a scintilla, of any serious artistic value.
By comparison, the go-go performances at Passaic liquor establishments are purity personified. The girls dance in halter tops and bikini-type bottoms; they are separated from the patrons on a separate stage inside the bar area. Their dancing is all "vertical"; there is no exposure of private parts at all.
*421 One of plaintiff's principal arguments is that Passaic obscenity ordinance, No. 350-76, is void by reason of preemption of the whole field of obscenity by the State. It contends that N.J.S.A. 2A:115-1 et seq. has preempted the field. In two cases, Dimor, Inc. v. Passaic, 122 N.J. Super. 296 (Law Div. 1973), and Wein v. Irvington, 126 N.J. Super. 410 (App. Div. 1974), certif. den 65 N.J. 287 (1974), dealing with obscene motion pictures and obscene materials in a book store, respectively, there is language that suggests a total take-over of the field by the State. A closer look leads this court to conclude that the take-over by the State is only partial, that is, it is limited to the field of obscene materials.
For the State to preempt a field of concern, the intention of the Legislature must appear clearly. Summer v. Teaneck, 53 N.J. 548 (1969). Even an expression of intent does not necessarily indicate that the entire field has been preempted by the State. It may partially occupy a field. Fred v. Old Tappan Mayor and Council, 10 N.J. 515 (1952); Coast Cigarette Sales, Inc. v. Long Branch Mayor and Council, 121 N.J. Super. 439 (Law Div. 1972), where the court said:
Absent a showing of intent to totally preempt, a municipality, pursuant to its delegated powers, can deal with specific local problems by expanding control in that area so long as there is no conflict with the Legislative proscription. [at 446]
New Jersey obscenity laws have had frequent amendments, both in 1957 and 1971. N.J.S.A. 2A:115-1.1 et seq. All these amendments are declarative of a concern for obscene materials. See N.J.S.A. 2A:115-1.6 and 2A:115-2.1, all referring to materials. Materials are repeatedly defined as descriptions, depictions, narrative accounts, films, etc. N.J.S.A. 2A:115-1.7, 2A:115-2.2. The Legislature seems preoccupied with a need for uniform treatment and standards for books, pictures, films, recordings  items that are all of a permanent nature.
*422 Live entertainment is something else. It not only varies from place to place, but night to night. Uniform treatment for immutable material is logical. Not so with live performances. A review of the case law fails to reveal a case where a local ordinance regulating live entertainment had preemption as an issue. E.g., Newark v. Humphres, 94 N.J. Super. 384 (Law Div. 1967).
Even the language relied on in Wein v. Irvington, supra 126 N.J. Super. at 414, "Nevertheless it is our view that statutes on obscenity enacted by the Legislature since 1957 and particularly in 1971, evidence a clear design for uniform Statewide treatment of the subject", clearly refers to enactments since 1957 and 1971. These are the amendments that refer only to obscene material. The one state law covering obscene conduct, N.J.S.A. 2A:115-1, has not been altered since 1906. The court is satisfied that obscene conduct in performances has not been preempted.
Plaintiff also attacks the Ordinance 350-76 as being unconstitutionally vague. The pertinent portion reads as follows:
It shall be unlawful for any person, organization or corporation to maintain * * * in the City of Passaic that shall engage in or allow, permit or suffer in or upon the premises any obscenity, lewdness, immoral, indecent acts or activity and any acts that would arouse the sexual desire of others or allow, permit or suffer the premises to be conducted in such a manner as to become a nuisance.
This court has ignored the latter phrase: "immoral, indecent acts or activity or any acts that arouse the sexual desires of others"; there is a serious question whether that language alone could resist such a constitutional attack. Plaintiff nevertheless says that the words "obscenity" or "lewdness" fail to sufficiently apprise one of the conduct which is proscribed. However, the Supreme Court of the United States, in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), not only gives the latest definition of obscenity, but also establishes examples *423 of obscenity which can be read into a local law. The procedure in Miller permits the individual states to either enact specific definitions or else permit the court of last resort in each state to judicially "construe" the required specificity into the law.
The New Jersey Supreme Court so construed the word "obscenity" into the Laws of 1971, c. 449 (N.J.S.A. 2A:115-1.1 et seq). See State v. De Santis, 65 N.J. 462 (1974), where the court held:
Pending further legislative action we construe the laws of 1971, c. 449, in a manner comparable to the construction by the Minnesota Supreme Court in [State v.] Welke, supra, 216 N.W.2d [641] at 646-647. That construction is referred to earlier in this opinion; it now furnishes adequate notice and warning that `articles and publications which are patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated, in patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals' (216 N.W.2d at 646) are embraced within the word "obscene" as used in L. 1971 c. 449. [at 473-474]
Should such judicial construction be limited to protect only the state statutes? (The reference above to "articles or publications" should not be deemed in any way to exclude obscene conduct. See, Miller v. California, supra.) In the opinion of this court the saving construction is fair notice to all in this State as to the meaning of obscenity. Ordinance 350-76 is entitled to its support as well.
This brings us to the final phase of the litigation in question. Defendant city sought to close down the operation and performances of plaintiff and it further sought a dismissal of plaintiff's complaint as a matter of law.
The city moved for summary judgment on both demands. As to the first demand, the court has little difficulty in enjoining the plaintiff's performances permanently. Certainly the record clearly reveals that at plaintiff's establishment the law is habitually being violated. Not only do we have specific dates between December 9, 1976 and February 17, 1977, but clearly the affidavits of the law clerks describing *424 the performances on February 17, 1977 not only indicate obscene conduct, but also it's clear that said conduct was in direct violation of this court's prohibitory order of February 14, 1977. Clearly, then, any attempts to monitor and limit the activities at the plaintiff establishment and permit the continuation of performances would for all practical purposes be futile.
N.J.S.A. 2A:130-2 states that a place where the law is habitually violated is a nuisance. The power of the Superior Court to enjoin such nuisances cannot be questioned. Alpine Mayor and Council v. Brewster, 7 N.J. 42 (1951).
Thus, the remaining question in view of all the dispositions made by the court is what, if anything, remains of plaintiff's cause of action sufficient to withstand defendant's motion for summary judgment?
Is a plenary trial necessary on plaintiff's allegations of malice and unlawful interference with its business? Representations of plaintiff's counsel at oral argument refer to news articles in Passaic papers, high-level meetings involving the mayor and councilmen, all allegedly for the purpose of thwarting the plaintiff enterprise.
Assuming all the above could be proved, the court is satisfied that notwithstanding such allegations there is insufficient evidence that would, as a matter of law, give rise to plaintiff's damage claim of the plaintiff against the city officials.
At the outset, it would appear that our Tort Claims Act, N.J.S.A. 59:1-1 et seq., is a serious obstacle to plaintiff's position. Specifically, N.J.S.A. 59:2-3 states that a public entity is not liable for injuries resulting from the exercise of judgment or discretion vested in the entity. Furthermore, N.J.S.A. 59:3-3 indicates that a public employee is not liable if, acting in good faith, he dant case law that indicates and stands for the principle that governmental decisions calling for the exercise of of-carries out, executes or enforces the law. There is abunficial *425 judgment or discretion must not be subject to the threat of tort liability. See, for example, Amelchenko v. Freehold, 42 N.J. 541 (1964). Finally, there is the rationale frequently repeated in case law that, given an improper motive or an unworthy purpose or even malice on the part of a government official, it will not destroy the privilege of immunity so long as the official is acting within limits of his authority. See Gissen v. Tackman, 401 F. Supp. 305 (D.N.J. 1975). See also Amodio v. Civil Service Comm'n, 81 N.J. Super. 22 (App. Div. 1963). The case law is abundantly clear that courts have continuously refused to look beyond a lawful purpose even if there is a suspicion that a somewhat less lofty one lurks in the background.
The court has also relied on Ajamian v. North Bergen Tp., 103 N.J. Super. 61 (Law Div. 1968), aff'd 107 N.J. Super. 175 (App. Div. 1969), cert. den. 398 U.S. 952, 90 S.Ct. 1873, 26 L.Ed.2d 292 (1970). The court in that case specifically points to the common law right of municipal government to abate a nuisance. Although that case and others similar to it are concerned with health violations, and although in Ajamian the matter is more emergent, there is certainly the clear reference in Ajamian that any public nuisance that interferes with any portion of the safety, health or morals of the community is a proper target for abrupt government action. The rationale set forth in Ajamian and other cases referred to therein is that as long as the alleged victim receives a hearing at some point in the proceedings, premature action on the part of a city official in acting to curb a public nuisance will not give rise to a claim for damages. This principle is set forth in many cases, and essentially it is a public policy determination that holds that to have the threat of liability hanging over public officials in regard to their public duties would, in the words of the eminent jurist, Learned Hand, "dampen the ardor of all but the most resolute or the most irresponsible, in the unflinching discharge of their duties." See *426 Gregoire v. Biddle, 177 F.2d 579, 581 (2 Cir.1949), cited in Gissen v. Tackman, supra.
Within about a week after the shutdown of plaintiff by the city the within action was brought by plaintiff. As indicated, a series of hearings took place and, indeed, the court thereafter allowed plaintiff to reopen. The court believes therefore that the hearing requirement called for in Ajamian has been met.
Thus, the court is satisfied that if there is a common-law right to abate a nuisance, which unquestionably there is, and if that right is coupled with a guarantee of a hearing at some stage for the alleged victim, then certainly, in the context of this litigation, the concern by the city officials resulting in the abrupt closedown on December 9, 1976 more than satisfies that test, as set down in Gissen and Ajamian, supra.
Nor is there anything before the court either by way of affidavit or even representations of counsel that would indicate any other concern on the part of the city but its legitimate one for the kind of conduct they feared would result and indeed turns out did result. In short, the court is satisfied that nothing before it indicated the need for a plenary hearing.