238 N.J. Super. 323 (1989)
569 A.2d 872
ADOLPH AND JILL DELBRIDGE, PLAINTIFFS,
v.
HONORABLE STEPHEN J. SCHAEFFER, J.S.C., ET AL., DEFENDANT.
Superior Court of New Jersey, Law Division Hudson County.
Decided January 23, 1989.
*328 Adolph Delbridge and Jill Delbridge, plaintiffs, pro se.
Michael Furda for defendants (W. Cary Edwards, Attorney General of New Jersey, attorney; Michael Furda and Pamela Katten on the brief).
VILLANUEVA, J.S.C.
Plaintiffs filed 42 complaints[1] against state, county and governmental agencies as well as private agencies and persons alleging, inter alia, conspiracy, fraud, malice, malicious prosecution, legal malpractice, medical malpractice and civil rights violations.
*329 This is a motion for summary judgment made by all of the above-listed defendants represented by the Attorney General to dismiss the complaint against them.[2]
The issues are: (1) whether judges enjoy absolute immunity; (2) whether the complaints against Governor Kean, Attorney General Edwards, DYFS and all other persons involved in the child-abuse proceedings are barred by the doctrine of quasi-judicial immunity; (3) whether Attorney General Edwards, his deputy, DYFS and the other defendants are immune from suit under N.J.S.A. 59:3-3 for their good faith execution and enforcement of law; (4) whether Governor Kean, Attorney General Edwards and all other state employees involved are immune because of the discretion vested in them under N.J.S.A. 59:2-3 and:3-2; (5) whether Governor Kean, Attorney General Edwards and other superiors are liable under the doctrine of respondeat superior; (6) whether DYFS, Bayonne Agency, Adoption Resource Center and the Department of Civil Service are "persons" within the meaning of 42 U.S.C.A. § 1983; (7) whether any respondeat superior theory exists under 42 U.S.C.A. § 1983; (8) whether plaintiffs have established the required elements of malicious prosecution based upon either a prior criminal judicial proceeding or a prior civil proceeding when no proceeding was terminated in their favor; (9) whether defendants are immune from suit, in any event, under 42 U.S.C.A. § 1983; and (10) whether claims for improper medical examinations are barred by N.J.S.A. 59:6-4.
The court holds that defendants are immune under all theories, and therefore, grants summary judgment dismissing the complaints against them.

*330 CHRONOLOGY OF EVENTS.

November 30, 1984.
Jill Schneider (now Delbridge) called a state hotline alleging[3] that daughter Jill had been sexually abused by the girl's father, Adolph Delbridge. This prompted an immediate investigation by DYFS.

January 25, 1985.
Five Delbridge children were placed in DYFS foster care.

April 10, 1985.
Adolph Delbridge pleaded guilty to a violation of N.J.S.A. 2C:24-4(a) (endangering the welfare of a child) and was sentenced to five years probation.

December 17, 1987.
The sixth Delbridge child, born subsequent to the above date, was placed in DYFS foster care.

December 23, 1987.
The seventh Delbridge child, born November 1987, was placed in DYFS foster care.

*331 April 1988.

Parental rights of plaintiffs to six of their children were terminated by order of the Hon. J. Leonard Hornstein, J.S.C. His findings of fact were made on April 14, 1988. Plaintiffs' appeal of this decision is pending.

PLAINTIFFS ARE COLLATERALLY ESTOPPED FROM ARGUING THE MERITS AND/OR THE EFFICACY OF THE DECISION TO REMOVE THEIR CHILDREN.
Under the doctrine of collateral estoppel,
[O]nce an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation. [Montana v. U.S., 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979)]
A party is thus precluded by collateral estoppel from relitigating matters or facts which the party actually litigated and which were determined in a prior action, involving a different claim or cause of action, and which were directly in issue between the parties. Mazzilli v. Accident & Casualty Ins. Co., etc., 26 N.J. 307, 314-316, 139 A.2d 741 (1958). This basic principle has been fully adopted and enforced by the courts of New Jersey. See, e.g., State v. Gonzalez, 75 N.J. 181, 186-187, 380 A.2d 1128 (1977).
Plaintiffs are collaterally estopped from pursuing these actions as the thrust of consolidated complaints against all defendants, including but not limited to DYFS, its various offices, staffers and consultants, because the decision to remove the Delbridges' children from them was already the subject of two prior family court actions. Plaintiffs cannot, and do not, now complain that they lacked a full and fair opportunity to litigate that decision in those prior actions. Their complaints are confined primarily to allegations of conspiracy, malice and intentional or negligent medical and legal malpractice. Indeed, Mr. Delbridge was present, and participated, in both proceedings.
*332 Likewise, when a party is "precluded from re-litigating an issue with an opposing party, he is also precluded from doing so with another person unless he lacked a full and fair opportunity to litigate the issue in the first action or unless other circumstances justify affording him an opportunity to relitigate the issue." United Rental Equipment Co. v. Aetna Life & Cas Ins. Co., 74 N.J. 92, 101, 376 A.2d 1183 (1977); Feniello v. University of Pennsylvania Hospital, 558 F. Supp. 1365, 1367 (D.N.J. 1983); Melikian v. Corradetti, 791 F.2d 274 (3 Cir.1986).
All of plaintiffs' complaints arise out of the proceedings in the Family Court before Judge Hornstein or in the criminal matter to which Mr. Delbridge pled guilty. For this court to allow the present complaints to stand and proceed to trial would require relitigation of issues already decided by courts of competent jurisdiction. This would not only damage or strain the foundation of American jurisprudence, but also destroy the concept of finality of court determinations and totally negate it. Any time a litigant, in any proceeding, whether a municipal traffic violation or an appeal to the United States Supreme Court, can by paying $75 (nothing if you claim indigency as here) relitigate the case ad infinitum.[4]
To the extent that Mr. Delbridge was a party in both family court proceedings, there is nothing to suggest he did not have a full and fair opportunity to voice those complaints with Judge Hornstein's decision to remove his children, which he voices now in some 41[5] consolidated complaints. Moreover, plaintiff *333 offers no reason why he could not, as a matter of law, obtain review of either or both family court orders.
Review is clearly available to plaintiffs in the form of an appeal (which is currently pending). If any of the decisions to remove the children were erroneous, as plaintiffs allege, it can be reversed by a higher court. To give plaintiffs a new avenue of recourse now for an old issue would defeat the purpose of the doctrine of collateral estoppel.
Therefore, plaintiffs are collaterally estopped from relitigating them.

JUDGES HORNSTEIN, HUMPHREYS AND SCHAEFFER ARE ABSOLUTELY IMMUNE FROM SUITS FOR DAMAGES ARISING OUT OF JUDICIAL ACTS WITHIN THEIR JURISDICTION.
"Few doctrines [are] more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction." Pierson v. Ray, 386 U.S. 547, 553-554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288, 294 (1967). "A judge is absolutely immune from liability for his judicial acts." Stump v. Sparkman, 435 U.S. 349, 359, 98 S.Ct. 1099, 1106, 55 L.Ed.2d 331, 341 (1978); Briscoe v. LaHue, 460 U.S. 325, 334, 103 S.Ct. 1108, 1115, 75 L.Ed.2d 96 (1983).
In Pierson, the Supreme Court held that this absolute immunity applies to suits brought under the Civil Rights Act of 1871, 42 U.S.C.A. § 1983. Later cases have affirmed this principle. See Stump, supra, 435 U.S. at 356, 98 S.Ct. at 1104; Briscoe, supra, 460 U.S. at 334, 103 S.Ct. at 1115 and Imbler v. Pachtman, 424 U.S. 409, 418, 96 S.Ct. 984, 989, 47 L.Ed.2d 128 (1976). The Supreme Court has consistently adhered to the rule that judges defending against § 1982 actions enjoy absolute immunity for acts performed in their judicial capacities. Dennis v. Sparks, 449 U.S. 24, 27, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980); Supreme Court of Virginia v. Consumers Union *334 of the United States, 446 U.S. 719, 733-734, 100 S.Ct. 1967, 1975, 64 L.Ed.2d 641, 654-655 (1980).
A judge is not deprived of this immunity even when an action taken is in error, malicious or in excess of his authority. Stump, supra, 435 U.S. at 356, 98 S.Ct. at 1104. See also Pierson, supra, 386 U.S. at 554, 87 S.Ct. at 1217 (immunity applies even when judge is accused of acting maliciously and corruptly).
The rationale for this rule was explained in Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974):
Public officials, whether governors, mayors or police, legislators or judges, who fail to make decisions when they are needed or who do not act to implement decisions when they are made do not fully and faithfully perform the duties of their offices. Implicit in the idea that officials have some immunity  absolute or qualified  for their acts, is a recognition that they may err. The concept of immunity assumes this and goes on to assume that it is better to risk some error and possible injury from that error than not to decide or act at all. [416 U.S. at 241-242, 94 S.Ct. at 1689; emphasis supplied]
As further explained by the Supreme Court in Dennis, supra:
Judicial immunity arose because it was in the public interest to have judges who were at liberty to exercise their independent judgment about the merits of a case without fear of being mulcted for damages should an unsatisfied litigant be able to convince another tribunal that the judge acted not only mistakenly but with malice and corruption. [449 U.S. at 31, 101 S.Ct. at 188]
Absolute immunity is needed to permit judges to render decisions with independence and without fear of consequences. Pierson, supra, 386 U.S. at 554, 87 S.Ct. at 1217. It is of the highest importance to the proper administration of justice that judges be free to act upon their own convictions without apprehension of the consequences to themselves. Stump, supra, 435 U.S. at 355, 98 S.Ct. at 1104. The immunity is intended to provide judges with the maximum ability to act fearlessly and impartially, without an atmosphere of intimidation. Ferri v. Ackerman, 444 U.S. 193, 203-204, 100 S.Ct. 402, 408-09, 62 L.Ed.2d 355 (1979). It is necessary to assure that judges can perform their function without harassment or intimidation. *335 Butz v. Economou, 438 U.S. 478, 512, 98 S.Ct. 2894, 2913, 57 L.Ed.2d 895 (1978).
The immunity is especially necessary given the nature of judicial proceedings. As the court explained in Pierson:
It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation. [386 U.S. at 554, 87 S.Ct. at 1218]
Or, as the court in Butz added: "Controversies sufficiently intense to erupt in litigation are not easily capped by a judicial decree. The loser in one forum will frequently seek another, charging the participants in the first with unconstitutional animus." 438 U.S. at 512, 98 S.Ct. at 2913.
Finally, the immunity is permitted because of the other safeguards that exist. The court in Butz noted that there is less need for private damage actions to control unconstitutional conduct where judges are involved:
The insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal are just a few of the many checks on malicious action by judges. [Ibid.]
The sole requirement for judicial immunity is that two criteria must be met. First, the act complained of must be a judicial act. Stump, supra, 435 U.S. at 360, 98 S.Ct. at 1106. Second, the judge must have jurisdiction over the subject matter before him at the time he acts. Id. at 356, 98 S.Ct. at 1104; Dennis, supra, 449 U.S. at 29, 101 S.Ct. at 187.
In Stump, the Supreme Court explained that a judicial act is one performed by a judge in his judicial capacity. 435 U.S. at 360, 98 S.Ct. at 1106.
The factors which determine whether an act by a judge is a judicial one relate to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity. [Id. at 362, 98 S.Ct. at 1107]
*336 The acts complained of in the present case were clearly judicial acts.
As to Judge Hornstein:
33599-87  findings of fact and entry of order in child custody case;
33600-87  findings of fact, weighing evidence, ordering psychological and other examinations and entry of order in child custody case;
XXXXXX-XX  findings of fact and entry of order permitting foster parents to relocate children to a more conducive environment upon proper application in a child custody case;
XXXXXX-XX and XXXXXX-XX  findings of fact and entry of order in child custody matter setting visitation schedule and ordering psychological evaluations.[6]
As to Judge Humphreys:
W-13097-88  for the appointment of members to the Child Placement Review Board and actions of its members acting in their official capacity as an arm of the family court. (See discussion later as to quasi-judicial immunity as it relates to the board itself.) All of these acts were performed in his capacity as assignment judge of Hudson County;
W-15005-88  for his actions as assignment judge in a supervisory capacity over Judge Hornstein.
As to Judge Schaeffer:
15007-88  for his actions as presiding judge of Hudson County in failing to supervise Judge Hornstein in his handling of a child custody case.
Clearly, plaintiffs' allegations against the judges are for their actions in their judicial capacities.[7] The first criterion for judicial immunity, therefore, is met.
The second criterion is whether the judge had jurisdiction over the subject matter before him at the time he acted. The scope of this jurisdiction must be broadly construed. Stump, supra, 435 U.S. at 356, 98 S.Ct. at 1104; Dennis, supra, 449 U.S. at 29, 101 S.Ct. at 187. The immunity will be denied only where the judge acted in the clear absence of all jurisdiction. Stump, supra, 435 U.S. at 357-358, 98 S.Ct. at 1105.

*337 For example, if a probate judge, with jurisdiction over only wills and estates, should try a criminal case, he would be acting in the clear absence of his jurisdiction. On the other hand, if a judge of a criminal court should convict a defendant of a nonexistent crime, he would be immune. [Id. at 357-358, n. 7, 98 S.Ct. at 1105 n. 7]
Plaintiffs cite Zarcone v. Perry, 581 F.2d 1039 (2 Cir.1978) in support of their position. Clearly, that case, where punitive damages were awarded against a judge who acted "without any colorable legal basis," id. at 1040, is inapplicable. The judge ordered the deputy sheriff and two others to bring the vendor/appellant through the crowded courthouse in handcuffs, and then the judge tongue-lashed the vendor, threatening him with legal action for selling him a "putrid" cup of coffee. In the present matter, all suits brought against the judges were for duties carried out while performing in their official capacity.
Similarly inapplicable is the case of Harper v. Merckle, 638 F.2d 848 (5 Cir.1981). Therein, the judge asked plaintiff to raise his right hand to be sworn, ordered plaintiff apprehended, held contempt proceedings and ordered plaintiff incarcerated. The controversy, however, that led to the incarceration did not center around any matter pending before the judge but, rather, around domestic problems of plaintiff's former wife, who worked in the court house. Plaintiff saw the judge in a social forum and did not visit the judge in his official capacity. In contrast to the case herein, the judge in Harper v. Merckle acted in a manner so as to use his office as an "offensive weapon to vindicate personal objectives." No party invoked judicial machinery for any purpose. The judge's conduct did not amount to "judicial acts." Nonjudicial acts are not cloaked with judicial immunity.
Plaintiffs contend that when Judge Hornstein discussed the child abuse case with the media, namely, the Jersey Journal, the judge lost his immunity. Plaintiffs, in response to this motion, submitted several newspaper clippings (apparently from the Jersey Journal  although the name of the newspaper *338 and dates of the articles were not on the copies) from early 1986.
One article in question stated:
They also allege that Superior Court Judge J. Leonard Hornstein of The Family Division in Hudson County said they will never see their children again. Hornstein said he cannot remember if he used the word "never."
In a previous interview with The Jersey Journal, Hornstein stated, "The children are not being returned to them."
The judge expressed this view three times during the interview saying, "Strictly speaking I shouldn't be talking about this. Everything that could have been done was attempted and we need cooperation from the biological parents. We did not get their cooperation."
The Jersey Journal received a phone call from Hornstein about two weeks after the initial interview. He stated that he meant the following: "At this time, the children are in placement now and will not be returned to them. I do not mean they will never go back to the parents. Circumstances can change."
Several months ago, The Jersey Journal ran a letter to the editor expressing the view of an individual who felt that DYFS had "far too much power" when investigating child abuse allegations. Hornstein sent a copy of the letter to attorneys and other people involved in the proceedings. It stated: "Enclosed is a copy of a letter to the editor appearing in the Jersey Journal on Friday, Jan. 16, 1987. The letter is signed `J.D., Bayonne.' It would appear that `JD' is Jill Schneider-Delbridge."
"I am sending this to you for your information and guidance."
Hornstein later explained why he mailed the news clipping by stating, "They (all those involved in the cases) should know about it. There are no surprises in these types of cases, and all information should be disclosed to everybody."
Prior to April 17, 1986, the court ordered plaintiffs not to discuss their case with persons not directly involved with the case. This caused plaintiffs to seek the aid of the American Civil Liberties Union of New Jersey, who filed a brief with Judge Hornstein on April 17, 1986 stating, inter alia:
In a sealed proceeding, defendant may legitimately be precluded from public comment on the proceedings themselves. But to bar him from speaking about the case in general constitutes a major infringement of his First Amendment rights without any showing whatsoever of the requisite "clear and present danger."
Nonetheless, the media still continued to publicize the case.
However, it was plaintiffs who went to the media about their family court matter; Judge Hornstein had the right to respond to plaintiffs' allegations.
*339 Immunity should not be lost because an aggrieved party takes his case to the media and a judge responds thereto to explain his judicial actions.
In the cases at bar, the judges clearly were acting within their jurisdiction. This action arises out of litigation in the Superior Court, Family Part. The Superior Court has original jurisdiction throughout the State on all causes. N.J. Const., (1947), Art. VI, § 3, par. 2. It has jurisdiction over all causes of divorce and child custody. N.J.S.A. 2A:34-8, -31. Furthermore, the Family Part of the Superior Court has jurisdiction over all matters, and is not limited to those formerly heard by the Juvenile and Domestic Relations Court. N.J.S.A. 2A:2-20. The Family Part shall hear all claims unique to, and arising out of, a family or family-type relationship. R. 5:1-2(a).
The two criteria of Stump having been met, the judges are absolutely immune from plaintiffs' suits. Such a conclusion is supported by other holdings in this jurisdiction. See Rosquist v. Jarrat Const. Corp., 570 F. Supp. 1206 (D.N.J. 1983) (judges of the New Jersey Superior Court, Superior Court, Appellate Division and Supreme Court are immune from suit); McAllister v. State, 396 F.2d 776 (3 Cir.1968) (chief justice of New Jersey Supreme Court is immune from suit).
To hold otherwise would not only be contrary to the mandates of the Supreme Court, but would be contrary to the policy set forth in those decisions. It would hinder the independent decision-making role of judges and create an atmosphere where judges could be harassed and intimidated by litigants threatening to bring civil suits.
Such a remedy is not necessary to protect plaintiffs' constitutional rights. Plaintiffs are protected by the safeguards provided by the judicial system. Furthermore, if plaintiffs believe that the acts alleged in their complaint did occur, they can raise them in the appeal they currently have pending. Instead, they appear to have done what the court warned against in Butz, supra; they considered themselves to have lost in one forum, *340 so they have charged unconstitutional animus in another forum. All of plaintiffs' allegations of error, malice and corruption by the defendant judges are insufficient to raise a claim upon which relief can be granted since the defendant judges are absolutely immune from suit.

PLAINTIFFS' COMPLAINTS AGAINST THE CHILD PLACEMENT REVIEW BOARD, DEPUTY ATTORNEY GENERAL JOAN HOLLERAN WALSACK, DIVISION OF YOUTH AND FAMILY SERVICES, BAYONNE BRANCH OF DYFS, THE ADOPTION RESOURCE CENTER, THOMAS BLATNER, WILLIAM WALDMAN, DREW ALTMAN, GOVERNOR THOMAS KEAN, DIVISION OF CRIMINAL JUSTICE, DYFS MEDICAL ASSISTANCE UNIT, ATTORNEY GENERAL W. CARY EDWARDS AND CHRISTIAN M. HANSON ARE BARRED BY THE DOCTRINE OF QUASI-JUDICIAL IMMUNITY.
As previously noted, judges acting within the scope of their official duties are absolutely immune from liability for damages, even under 42 U.S.C.A. § 1983. Pierson v. Ray, supra. Similarly, quasi-judicial officials acting within the scope of their official duties are absolutely immune. See, e.g., Imbler v. Pachtman, supra (state prosecuting attorney); Bauers v. Heisel, 361 F.2d 581 (3 Cir.1966), cert. den. 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457 (1967) (prosecuting attorney); Silver v. Dickson, 403 F.2d 642 (9 Cir.1968), cert. den. 394 U.S. 990, 89 S.Ct. 1477, 22 L.Ed.2d 765 (1969) (parole board members); Bethea v. Reid, 445 F.2d 1163 (3 Cir.1971) (assistant U.S. Attorney); Brown v. Joseph, 463 F.2d 1046 (3 Cir.1972) (county public defender).
Under the common law, protection for judges and prosecutors formed part of a "cluster of immunities protecting the various participants in judge-supervised trials," which stemmed "from the characteristics of the judicial process." Briscoe, supra, 460 U.S. at 335, 103 S.Ct. at 1115, quoting Butz v. *341 Economou, supra, 438 U.S. at 512, 98 S.Ct. at 2913. Over the years this principle has been extended to afford lower level court officers immunity from burdensome litigation related to the performance of their official duties.
In the cases at bar, all of the above defendants were acting in their official capacity in a matter before the Superior Court of New Jersey  Family Part or in a criminal matter before the Superior Court. All of plaintiffs' allegations against these defendants derive from the following court proceedings.
The Child Placement Review Board:
33595-87  failure to make correct findings of fact, recommendations and evaluations in a child custody matter.
Deputy Attorney General Joan Holleran Walsack:
33596-87 and 33598-87  malicious prosecution, perjury, slander, incorrect evaluation of psychological and medical exams in a child custody matter;
W-15513-88 and W-016519-88  for participating in a family court proceeding wherein Judge Hornstein granted permission for foster parents to move children out-of-state and in the child custody proceedings.
The Division of Youth and Family Services and the Bayonne DYFS:
33597-87  perjury, malicious prosecution, suppression of evidence in a child custody case;
33603-87 and XXXXXX-XX  acts relating to order of Judge Hornstein removing plaintiffs' child and compliance therewith;
XXXXXX-XX  slander in a document involving a family court matter;
W-015515-88  actions in relation to Judge Hornstein's order permitting foster parents to move children out-of-state.
The Adoption Resource Center:
33597-87  failure to make proper evaluations in a child custody matter;
W-015515-88  actions in relation to Judge Hornstein's order permitting foster parents to move children out-of-state.
Thomas Blatner and William Waldman:
33597-87  as Director and Acting Director of Bayonne DYFS they were responsible for the actions and participation of DYFS in a child custody case before Judge Hornstein.
Attorney General W. Cary Edwards:
33598-87  as superior of Deputy Attorney General Walsack for her participation in a family court proceeding before Judge Hornstein.

*342 33602-87  for failure to supervise Hudson County prosecutor in a criminal matter which terminated in a guilty plea by plaintiff, Adolph Delbridge.
W-016519-88  for his failure to supervise Deputy Attorney General Walsack in her participation in a family court matter, wherein Judge Hornstein entered an order permitting foster parents to move children out of state.
Drew Altman:
XXXXXX-XX  as Commissioner of Human Resources for failure to oversee DYFS in its participation in a family court proceeding.
Governor Thomas Kean:
XXXXXX-XX  as Governor, for failure to oversee the Attorney General and DYFS in their participation in a family court proceeding.
Division of Criminal Justice, Prosecutor, Supervisory Section:
33602-87  for its failure to oversee the Hudson County prosecutor in a criminal court proceeding.
Christian M. Hanson:
4030  for a medical and psychological evaluation of a child in a family court matter.
DYFS Medical Assistance Unit:
4032-88  for an improper medical and psychological evaluation of a child in a family court matter.
All of the complaints against these defendants are for their participation, either directly or as "superiors," in Superior Court proceedings. They arise out of a matter that was properly before Judge Hornstein in the Family Part or out of a criminal matter.
The rationale for granting immunity to judicial and quasi-judicial officers in § 1983 actions was explored at length by the Supreme Court in Imbler v. Pachtman, supra, 424 U.S. at 437-440, 96 S.Ct. at 998-99, when it extended absolute immunity to public prosecutors. The court emphasized the importance to the prosecutorial function of independence and freedom from harassment. Harassment by disgruntled litigants "would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." Id. at 423, 96 S.Ct. at 991.
*343 A public official acting pursuant to court directive is immune from suit. Lockhart v. Hoenstine, 411 F.2d 455 (3 Cir.1969), cert. den., 396 U.S. 941, 90 S.Ct. 378, 24 L.Ed.2d 244 (1969). Many of the above defendants were, in certain instances, acting pursuant to Judge Hornstein's orders. They all acted within their mandate under N.J.S.A. 30:4C-50 et seq. and R. 5:1-1 et seq.
The concerns motivating the broad grant of immunity for judges, prosecuting attorneys and public defenders are not as strong with regard to the ministerial functions of court officers. Nevertheless, the grant of immunity for these public officials is still premised upon the policy determination that these individuals should not be subject to any pressures which may affect the impartial administration of their responsibilities. Thus, all defendants are entitled to immunity from the allegations as a matter of law.
As the Supreme Court explained in Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).
This Court early held that judges of courts of superior or general authority are absolutely privileged as respects civil suits to recover for actions taken by them in the exercise of their judicial functions, irrespective of the motives with which those acts are alleged to have been performed,... and that a like immunity extends to other officers of government whose duties are related to judicial process. [360 U.S. at 569, 79 S.Ct. at 1338; emphasis supplied]
To hold these defendants liable to plaintiffs would place them between the vice of failure to perform their statutory and court-ordered duties on the one hand and the fear of civil liability on the other.
It was the need to protect the judiciary from this fear, threat, harassment and intimidation of civil lawsuits that led to the creation of judicial immunity. See Pierson, supra, 386 U.S. at 554, 87 S.Ct. at 1217; Stump, supra, 435 U.S. at 363, 98 S.Ct. at 1108; Ferri v. Ackerman, supra, 444 U.S. at 193, 203-204, 100 S.Ct. at 404, 408-09 (1979); and Butz v. Economou, supra, 438 U.S. at 512, 98 S.Ct. at 2913. It certainly would be anomalous to hold judicial officers liable for acts performed *344 while under the jurisdiction of the court when the judges would be immune if they, themselves, so acted. To do so, especially in a child replacement matter, would be to deny judges valuable resources provided by rules and statutes in making their difficult decisions.
Since absolute immunity is applicable to these defendants, the court must determine whether the criteria for immunity exist in this case. A judicial officer will not be deprived of judicial immunity even when the action taken was in error, done maliciously, corruptly or in excess of this authority. Stump, supra, 435 U.S. at 355-356, 98 S.Ct. at 1104; Pierson, supra, 386 U.S. at 554, 87 S.Ct. at 1217.
In the case at bar, these defendants were performing judicial acts within the jurisdiction of the Superior Court, Family Part or in the Superior Court in a criminal matter. Therefore, they are absolutely immune from plaintiffs' suits.

DEFENDANTS, DEPUTY ATTORNEY GENERAL JOAN WALSACK DYFS, ATTORNEY GENERAL W. CARY EDWARDS, THE CHILD PLACEMENT REVIEW BOARD, THOMAS BLATNER, THE ADOPTION RESOURCE CENTER, WILLIAM WALDMAN, THE DIVISION OF CRIMINAL JUSTICE, CHRISTIAN M. HANSON, DYFS MEDICAL ASSISTANCE UNIT, GOVERNOR THOMAS KEAN AND COMMISSIONER DREW ALTMAN, ARE IMMUNE FROM SUIT UNDER THE NEW JERSEY TORT CLAIMS ACT N.J.S.A. 59:3-3 FOR THEIR GOOD FAITH EXECUTION AND ENFORCEMENT OF LAW.
In response to the Supreme Court's abrogation of the common law doctrine of sovereign immunity from tort liability in Willis v. Dept. of Cons. & Ec. Dev., 55 N.J. 534, 264 A.2d 34 (1970), the Legislature enacted the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 et seq., which re-established sovereign immunity absent specific provisions within the act for liability. Burg v. *345 State, 147 N.J. Super. 316, 371 A.2d 308 (App.Div. 1977), certif. den. 75 N.J. 11, 379 A.2d 242 (1977); English v. Newark Housing Auth., 138 N.J. Super. 425, 428-429, 351 A.2d 368 (App.Div. 1976). To that end, N.J.S.A. 59:1-2 states in pertinent part:
[I]t is hereby declared to be the public policy of this State that public entities shall only be liable for their negligence within the limitations of this act and in accordance with the fair and uniform principles established herein.
Similarly, N.J.S.A. 59:2-1(a) indicates:
Except as otherwise provided by this act, a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person.
The Legislature expressly limited the State's liability to situations where a state employee is liable. N.J.S.A. 59:2-2(b). It is entitled, therefore, to invoke the same immunities as its employees. One of the immunities in N.J.S.A. 59:3-3, is: "A public employee is not liable if he acts in good faith in the execution or enforcement of any law...."
It is well settled that to state a cause of action under this section, a complaint must allege more than negligence. As the court explained in Marley v. Palmyra Bor., 193 N.J. Super. 271, 473 A.2d 554 (Law Div. 1983):
"Good faith" may exist in the presence of negligence. That this is true seems apparent from our Legislature's use of the words "good faith" instead of "due care," as found in the Federal Tort Claims Act, supra. The absence of due care is negligence; the absence of good faith may not relate to negligence. The New Jersey Act therefore provides immunity to public employees engaged in law enforcement notwithstanding their negligence, so long as they act in "good faith." [Id. at 295, 473 A.2d 554]
In Expo, Inc. v. City of Passaic, 149 N.J. Super. 416, 373 A.2d 1045 (Law Div. 1977), the court noted that even when bad faith exists, it will not defeat the immunity if the public employee was acting within his authority.
The court explained:
... there is the rationale frequently repeated in case law that, given an improper motive or an unworthy purpose or even malice on the part of a government official, it will not destroy the privilege of immunity so long as the official is acting within the limits of his authority.... The case law is abundantly clear that courts have continuously refused to look beyond a lawful *346 purpose even if there is a suspicion that a somewhat less lofty one lurks in the background. [Id. at 425, 373 A.2d 1045]
More recently, New Jersey courts have adopted the "objective reasonableness" standard of Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), in defining the good faith immunity of N.J.S.A. 59:3-3. See Hayes v. Mercer County, 217 N.J. Super. 614, 526 A.2d 737 (App.Div. 1987). The Hayes court explained: "To prevail on a motion for summary judgment, a public employee need not establish his subjective, i.e., actual, good faith if his conduct was objectively reasonable." Id. at 622, 526 A.2d 737.
Under Harlow, bare allegations of malice are not sufficient to subject a public employee to broad-reaching discovery or trial. The Supreme Court sought to avoid the disruption of effective government caused by litigation through resolution on summary judgment. It held, therefore, that a public official is immune from liability unless he or she violates a clearly established law of which a reasonable person would have known. 457 U.S. at 817-818, 102 S.Ct. at 2737-38.
In light of Harlow and its progeny, Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the test becomes whether a public employee would have reasonably believed that his or her actions were lawful in light of clearly established law. Anderson, supra, 107 S.Ct. at 3040. The law violated must be sufficiently clear that a reasonable public employee would understand that what he or she is doing violates that law. The unlawfulness must be apparent from preexisting law. Id. at 3039.
In the case at bar, all the actions of the above defendants who participated in the family court proceeding that was instituted and investigated by DYFS as a result of Jill Delbridge's complaint about sexual abuse were mandated by and in accordance with state law. Anyone having reasonable cause to believe that a child has been abused must report it to DYFS. See N.J.S.A. 9:6-8.10. Failure to do so is a disorderly persons offense. N.J.S.A. 9:6-8.14.
*347 Once a report has been received, DYFS "shall" immediately take all necessary action to insure the safety of the child. N.J.S.A. 9:6-8.11. This action includes investigating the circumstances under which the child was injured. N.J.S.A. 9:6-8.18. DYFS "shall" immediately report the incident of suspected child abuse to the county prosecutor. N.J.S.A. 9:6-8.36a. DYFS may also request and receive appropriate assistance from local and state law enforcement officials. N.J.S.A. 9:6-8.11.
Administrative regulations have been adopted to help define cases that must be referred by DYFS workers to county prosecutors. See N.J.A.C. 10:129-1.1 et seq. These cases include those subjecting or exposing a child to unusual or inappropriate sexual activity, and injuries or conditions resulting in hospitalization, emergency room treatment or anything more than superficial medical attention. N.J.A.C. 10:129-1.3(a). The caseworker need not complete an investigation or secure "solid evidence" of abuse or neglect before contacting the prosecutor. Once a case falls within one of the above categories the only requirement is "some suspicion that the child's condition or injury probably was not accidentally caused." N.J.A.C. 10:129-1.3(d).
The caseworker is required to send to the prosecutor a written referral on form DYFS 9-7 containing a narrative description of essential facts. N.J.A.C. 10:129-1.3(e). The caseworker may also communicate an opinion on the need for investigation by a law enforcement agency. N.J.A.C. 10:129-1.4.
DYFS can confer with a complainant concerning the advisability of filing a complaint and attempt to "adjust" cases before a complaint is filed. It cannot, however, prevent anyone from filing a complaint with the courts. N.J.S.A. 9:6-8.35. The decision to prosecute those complaints is made by the county prosecutor. N.J.A.C. 10:129.1.5(c). The law regarding DYFS' ultimate responsibility is clear: it must immediately investigate *348 reports of child abuse and take necessary action to protect a child which it finds at risk as a result of such investigation. In another statute that, at times, parallels the provisions of N.J.S.A. 9:6-1 et seq., N.J.S.A. 30:4C-12, DYFS is given a duty to investigate complaints of child abuse involving anyone with custody or control of that child. That statute provides, in pertinent part:

Upon receipt of a complaint as provided in this section, the Bureau of Childrens Services shall investigate, or shall cause to be investigated, the statements set forth in such complaint. If the circumstances so warrant, the parent, parents, guardian, or person having custody and control of the child shall be afforded an opportunity to file an application for care, as provided in Section II of this act.[8] If the parent, parents, guardian, or person having custody and control of the child shall refuse to permit or shall in any way impede investigation, and the bureau determines that further investigation is necessary in the best interests of the child, the bureau may thereupon apply to the Juvenile and Domestic Relations Court of the county where the child resides, for an order directing the parent, parents, guardian, or person having custody and control of the child to permit immediate investigation. The court, upon such application, may proceed to hear the matter in a summary manner and if satisfied that the best interests of the child so require may issue an order as requested. [N.J.S.A. 30:4C-12; emphasis supplied]
All of the actions of defendants were carried out in the execution and enforcement of the child abuse laws of this State, either directly in the custody matter before Judge Hornstein, in the criminal matter or in a "supervisory capacity" of those directly involved. The objective "good faith" of their actions was validated by Judge Hornstein in his findings of fact and entry of orders in their favor against plaintiffs. The "good faith" of the Hudson County prosecutor is validated by the admission through a plea of guilty by plaintiff in the criminal proceeding. Those in "supervisory capacities" and the public entities are shielded through a special tenet of law that the master cannot be liable for the servant's actions if the servant is not.
If these defendants were not immune and were obliged to defend their actions in a civil trial (and litigate the same issues *349 already litigated, decided and currently on appeal), a most chilling effect would be visited upon them. When others in the field of preventing child abuse learn of this case, it could have a catastrophic effect if persons, such as these defendants, were held not to be immune. What reasonable DYFS employee, in deciding whether to pursue an allegation of child abuse, would fail to ask himself whether he wants to end up at risk in a similar lawsuit? What is worse, it is precisely in those cases (unlike this case) where the indications of abuse are subtle or sketchy  and, thus, most in need of investigation  that the chilling effect of such a decision will be felt most.
As the court explained in Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), under the "objective good faith" test of qualified immunity, the entitlement:
is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial. [472 U.S. at 526, 105 S.Ct. at 2815.]
See also Harlow v. Fitzgerald, supra, 457 U.S. at 816, 102 S.Ct. at 2737; see also Fees v. Trow, 105 N.J. 330, 521 A.2d 824 (1987) (discussing the need for courts to protect state employees who report suspected instances of abuse of mental patients from retaliatory defamation suits). Society and the interests of justice would be ill served if a denial of immunity were to cause DYFS workers to fear retaliatory litigation. Society's battle against child abuse (the general public importance of which is in the media every day) cannot be successfully waged by soldiers suffering from a siege mentality.
The Legislature has expressed the concerns and will of the community in this area by enacting statutes designed to achieve:
the protection of children under 18 years of age who have had serious injury inflicted upon them by other than accidental means. It is the intent of this legislation to assure that the lives of innocent children are immediately safeguarded from further injury and possible death and that the legal rights of such children are fully protected. [N.J.S.A. 9:6-8.8]
*350 Instead of being praised for having performed their statutory mandate, defendants now find themselves subject to these lawsuits.
Defendants are afforded this good faith immunity so that persons and entities in the field of child protection may exercise their duties without undue fear of retaliatory litigation. If even one child suffers continued physical abuse because a DYFS worker or some other participant in a child custody case was dissuaded from pursuing an investigation by threat of potential lawsuits, the result would be an irreparable injury.
Defendants are entitled to summary judgment as a matter of law dismissing the complaints against them, since they are immune for their good faith enforcement of law pursuant to N.J.S.A. 59:3-3.

DEFENDANTS, GOVERNOR KEAN, ATTORNEY GENERAL EDWARDS, COMMISSIONER ALTMAN, DIRECTOR BLATNER, ACTING DIRECTOR WALDMAN, EUGENE MCCAFFREY, JEAN ROSS, JUDGE HORNSTEIN, JUDGE SCHAEFFER, JUDGE HUMPHREY, DYFS, THE BAYONNE BRANCH OF DYFS, THE CHILD PLACEMENT REVIEW BOARD, THE ADOPTION RESOURCE CENTER, THE DIVISION OF CRIMINAL JUSTICE, THE DEPARTMENT OF CIVIL SERVICE & THE CITIZENS ACTIONS LINE ARE ENTITLED TO SUMMARY JUDGMENT SINCE THE EXERCISE OF DISCRETION VESTED IN THEM IS IMMUNIZED BY THE TORT CLAIMS ACT, N.J.S.A. 59:2-3 AND:3-2.
In order to ascertain the parameters of tort liability for state officials, such as the above defendants, reference must be made to the Tort Claims Act ("act"), N.J.S.A. 59:1-1 et seq. The act, as it relates to a public employee's conduct, represents an attempt by the Legislature to reach a fair accommodation between removing the constant threat that an exercise of an official's authority or discretion will be second-guessed, and *351 thereby, subjected to legal challenge, and the necessity of mandating that such public officials conform their actions to a certain level of propriety. Pursuant to N.J.S.A. 59:3-2, decisions of this type have been immunized, recognizing that public employees, such as the above defendants, frequently engage in a wide range of discretionary decision-making, not of all of which could be anticipated but which often affect, and possibly disgruntle, vast numbers of people. See Longo v. Santoro, 195 N.J. Super. 507, 480 A.2d 934 (App.Div. 1984) (extending the same reasoning applied to public entity discretionary decisions to discretion exercised by public employees); Expo., Inc. v. City of Passaic, supra, 149 N.J. Super. at 424-425, 373 A.2d 1045 (immunizing governmental decisions predicated on the exercise of an official's judgment from the prospect of tort liability). Additionally, the Legislature, having taken notice of particular responsibilities which pervade public employment on a daily basis, i.e., enforcement of laws, issuance of permits, licenses, etc., inspection and maintenance of public property, has adopted certain specific immunities for such conduct. See Malloy v. State, 76 N.J. 515, 520-521, 388 A.2d 622 (1978) (recognizing that licensing immunity is so "pervasive" that it applies to all phases of the "licensing function," whether discretionary or not); Marley v. Palmyra Bor., supra; Bosch v. Hain, 184 N.J. Super. 204, 445 A.2d 465 (Law Div. 1982). A state official whose actions are immunized under the act may be stripped of this protection against liability only when his/her actions are "outside the scope of ... employment or constitute a crime, actual fraud, actual malice of willful misconduct." N.J.S.A. 59:3-14a.
Public entities, however, have no such qualifying language as to "malice or willful misconduct" and are absolutely immune under N.J.S.A. 59:2-3(b). Dlugosz v. Fred S. James & Co., 212 N.J. Super. 175, 180-182, 514 A.2d 538 (Law Div. 1986) (decision to discharge a police officer is discretionary action of a judicial or legislative nature); Fair v. County of Bergen, 151 N.J. Super. 520, 377 A.2d 700 (App.Div. 1977) (court attendant *352 carrying documents is acting as agent of the court and enjoys absolute judicial immunity); Nicoletta v. No. Jersey District Water Supply Commission, 77 N.J. 145, 167-168, 390 A.2d 90 (1978) (discharge of employee by water district supply commission immunized). The official comment of the 1972 Attorney General's Task Force Report on Sovereign Immunity to N.J.S.A. 59:2-3 comment states:
Subsection (b) specifies an absolute immunity which is contained in existing New Jersey case law and which recognizes the principle that certain high-level decisions calling for the exercise of official judgment or discretion must not be subject to the threat of tort liability. As the courts have pointed out "it cannot be a tort for government to govern." Amelchenko v. Freehold Borough, 42 N.J. 541, 550 [201 A.2d 726] (1964); Willis v. Department of Conservation and Economic Development, 55 N.J. 534, 540 [264 A.2d 34] (1970); Miehl v. Darpino, 53 N.J. 49 [247 A.2d 878] (1968); Fahey v. City of Jersey City, 52 N.J. 103 [244 A.2d 97] (1968); Hoy v. Capelli, 48 N.J. 81 [222 A.2d 649] (1966).
Here, the complaints against the public entities are for their use of, or failure to use, the discretionary authority endowed in them by state law. Accordingly, the entities are absolutely immune for the exercise of that judgment.
Plaintiffs' claim of malice as to the public employees, based merely upon an allegation of subjective bad faith, is rejected for fear of significantly detracting from the vitality of the Act's immunities by requiring the trial of all tort suits brought against public employees. See Cashen v. Spann, 66 N.J. 541, 552, 334 A.2d 8, cert. den. 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 46 (1975), on remand 143 N.J. Super. 560, 364 A.2d 21 (Law Div. 1976), aff'd on other grounds 150 N.J. Super. 500, 376 A.2d 186 (App.Div. 1977), rev'd on other grounds 77 N.J. 138, 389 A.2d 969 (1978). As has already been noted, comparable measures were taken in Harlow v. Fitzgerald, supra, to protect against artful pleading designed to get such issues to a jury.
As has been previously discussed, an objective test applied to this case defeats the mere allegations of malice. This is especially true, given the fact finding and orders of Judge Hornstein and the guilty plea of plaintiff in his criminal matter.
*353 All of the public officials above cited have acted within the discretion vested in them.
Governor Kean  in his capacity as Governor in supervising the Attorney General, Deputy Attorney General and DYFS.
Attorney General Edwards  in his capacity to oversee Deputy Walsack and the Hudson County Prosecutor.
Commissioner Altman, Director Blatner, and Acting Director Waldman  in their capacities of overseeing DYFS.
Eugene McCaffrey  in his capacity of overseeing Civil Service.
Jean Ross  in an official capacity of overseeing the Citizens Action Line.
Judges Hornstein, Schaeffer and Humphreys  in their capacities as judges of the Superior Court.
It is this discretion that plaintiff alleges was either improperly used or not used. However, only Deputy Walsack and Judge Hornstein had any direct dealings with plaintiffs.
Accordingly, these defendants are entitled to summary judgment as a matter of law since they are immune for the exercise of discretion vested in them pursuant to N.J.S.A. 59:2-3 and:3-2.

DEFENDANTS, GOVERNOR THOMAS KEAN, ATTORNEY GENERAL W. CARY EDWARDS, JUDGE HUMPHREYS, JUDGE SCHAEFFER, THOMAS BLATNER, WILLIAM WALDMAN, COMMISSIONER ALTMAN, EUGENE MCCAFFREY AND JEAN ROSS ARE ENTITLED TO DISMISSAL BECAUSE THE COMPLAINTS AGAINST THEM CONSTITUTE AN IMPROPER APPLICATION OF RESPONDEAT SUPERIOR.
All of the complaints against defendants above are based upon their "supervisory capacities." Any liability on the part of these defendants is alleged on a theory of agency, more properly in a legal context as respondeat superior.
Under the Tort Claims Act, N.J.S.A. 59:3-1(a), a public employee is liable for injury he or she causes, to the same extent as a private individual, except as the act otherwise provides. In addition, a public employee is entitled to defenses which would be available to a private citizen. N.J.S.A. 59:3-1(b). *354 One such defense is that the doctrine of respondeat superior does not allow a plaintiff to recover from superior employees for the torts of subordinate employees absent the superior employee's direct participation in the tort.
In Trustees Structural Steel v. Huber, 136 N.J. Super. 501, 347 A.2d 10 (App.Div. 1975), certif. den. 70 N.J. 143, 358 A.2d 190 (1976), the court noted that a corporate officer or director may be held personally liable only for torts in which he is personally involved.
It is well established that while a director or officer of a corporation does not incur personal liability for its torts merely by reason of his official character, if he directs the tortious act to be done, or participates or cooperates therein, he is personally liable to third persons injured or damaged thereby, even though liability may also attach to the corporation. [Id. at 505, 347 A.2d 10]
See also McGlynn v. Schultz, 95 N.J. Super. 412, 416, 231 A.2d 386 (App.Div. 1967), certif. den. 50 N.J. 409, 235 A.2d 901 (1967); Miller v. Muscarelle, 67 N.J. Super. 305, 320, 170 A.2d 437 (App.Div. 1961), certif. den. 36 N.J. 140, 174 A.2d 925 (1961).
In Evans v. Rohrbach, 35 N.J. Super. 260, 113 A.2d 838 (App.Div. 1955), certif. den. sub nom. Evans v. Matthews, 19 N.J. 362, 117 A.2d 203 (1955), the Appellate Division discussed the liability of a prison superintendent's corporate counterpart, a company official, for an employee's tort. The court said that
... while `a director or officer of a corporation does not incur personal liability for its torts merely by reason of his official character,' yet `a director or officer who commits the tort or who directs the tortious act to be done, or participates or cooperates therein, is liable to third persons injured thereby, even though liability may also attach to the corporation for the tort.' [Id. at 263-264, 113 A.2d 838]
The Evans court upheld a grant of summary judgment in favor of a corporation's president and vice-president in charge of operations. Plaintiff was injured when certain employees failed to follow corporate safety regulations. The court rejected the contention that the president might be vicariously liable for the acts of the employees because there was no hint of any direct link between him and the accident. It then addressed the more difficult question of the vice-president's liability and concluded that he was "reasonably entitled to assume, in the absence of *355 notice to the contrary, that the safety regulations concededly promulgated by the company ... were being enforced and that supervision in that regard was being exercised by one or more of those responsible in the chain of authority." Id. at 266, 113 A.2d 838. The fact that he was in charge of the plant where the accident occurred was held not sufficient to impose liability.
In this case, plaintiffs seek to hold defendants liable for the alleged torts of "lower level employees." There is no doubt that these defendants had no personal involvement in the actions involving plaintiffs, a necessary requirement for them to be found liable. Thus, they are entitled to summary judgment as a matter of law.

THE DIVISION OF YOUTH AND FAMILY SERVICES, THE BAYONNE DYFS AGENCY, ADOPTION RESOURCE CENTER AND THE DEPARTMENT OF CIVIL SERVICE ARE NOT "PERSONS" WITHIN THE MEANING OF 42 U.S.C.A. § 1983.
42 U.S.C.A. § 1983 provides in pertinent part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
To be liable within the meaning of the statute, a defendant must be a "person." In Quern v. Jordan, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), the Supreme Court held that states are not subject to the jurisdiction of federal courts in a § 1983 action because of the Eleventh Amendment. In so holding, the Court noted that Congress did not intend to waive the states' sovereign immunity by enacting § 1983. 440 U.S. at 342-343, 99 S.Ct. at 1146. Further, the Court implied that a state is not a "person" for purposes of § 1983. Id. at 350, 99 S.Ct. at 1150 (Brennan, J., concurring); Bailey v. Ohio State University, 487 F. Supp. 601, 603 (S.D.Ohio 1980) (the state is not a person under § 1983).
*356 In addressing this issue, the New Jersey Supreme Court recently followed the majority of the states in holding that neither a state nor its alter ego is a person for purposes of § 1983 regardless of whether the action is brought in state or federal court. Fuchilla v. Layman, 109 N.J. 319, 537 A.2d 652 (1988). Thus, "if a governmental entity enjoys immunity as the state or its alter ego under the Eleventh Amendment, it cannot be liable as a `person' under Section 1983." Id. at 324, 537 A.2d 652, citing Kovats v. Rutgers, 633 F. Supp. 1469, 1477 (D.N.J. 1986).
The Department of Civil Service is a division of the State of New Jersey Department of Personnel and Merit System Board. It was established by statute pursuant to N.J.S.A. 11:3-1.
Defendants Adoption Resource Center and the Bayonne DYFS Agency are branches of the Division of Youth and Family Services. The Division of Youth and Family Services is a sub-division of the Department of Human Services. The Department of Human Services was established by statute, N.J.S.A. 30:1A-1, and is within the executive branch of New Jersey state government.
Therefore, any alleged § 1983 violations contained in the complaints against defendants, Division of Youth and Family Services, Bayonne DYFS Agency, Adoption Resource Center and the Department of Civil Services, do not state claims for which relief can be granted.

NO RESPONDEAT SUPERIOR THEORY EXISTS UNDER 42 U.S.C.A. § 1983.
Under 42 U.S.C.A. § 1983, liability can be imposed for conduct which "subjects, or causes to be subjected," a person to a deprivation of a right granted by the United States Constitution and laws. See also Rizzo v. Goode, 423 U.S. 362, 370-371, 96 S.Ct. 598, 604, 46 L.Ed.2d 569 (1976).
Based upon this standard, to state a claim under § 1983 the complaint must allege specific conduct by a state *357 official which violates a constitutional right of plaintiff. Ruffin v. Beal, 468 F. Supp. 482, 490 (E.D.Pa. 1978). See also Gittlemacker v. Prasee, 428 F.2d 1, 3 (3 Cir.1970). It is clear that personal involvement is a necessary element of a § 1983 claim, and that a superior official is not liable for the acts of his subordinates, merely on the basis of that relationship. Hence, the principle of respondeat superior is not applicable to suits brought under § 1983. Goode, supra, 423 U.S. at 370-371, 96 S.Ct. at 603-04; Cotton v. Hutto, 577 F.2d 453, 455 (8 Cir.1978); Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1082 (3 Cir.1976); Bracey v. Grenoble, 494 F.2d 566 (3 Cir.1974); Connor v. Jeffes, 67 F.R.D. 86, 90-91 (M.D.Pa. 1975).
In the case at bar, there is no personal conduct alleged as to defendants Governor Thomas H. Kean, Eugene McCaffrey, Commissioner Drew Altman, William Waldman, and Thomas Blatner. The only allegation against these defendants is that they neglected to do anything about the family court proceedings and the conduct of all parties involved in the proceedings. Since plaintiffs have failed to allege any personal conduct by these defendants, depriving them of a constitutional right, but instead base their claims upon a respondeat superior theory, these defendants are entitled to summary judgment.
In any event, negligence claims are not encompassed within the Civil Rights Act. 42 U.S.C.A. § 1983. Davidson v. O'Lone, 752 F.2d 817 (3 Cir.1984), cert. granted 471 U.S. 1134, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985); Daniels v. Williams, 474 U.S. 327, 336, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (concurring opinion).

PLAINTIFFS CAN NOT ESTABLISH THE REQUIRED ELEMENTS OF MALICIOUS PROSECUTION BASED ON EITHER A PRIOR CRIMINAL JUDICIAL PROCEEDING OR A PRIOR CIVIL PROCEEDING.
Although it is not pleaded in plaintiffs' complaints, it appears that plaintiffs are alleging malicious prosecution based upon *358 both Adolph Delbridge's prior criminal proceedings and the pending family court proceedings. Plaintiffs bring these allegations against defendants, Deputy Attorney General Joan Walsack, Attorney General W. Cary Edwards, Division of Youth and Family Services, Thomas Blatner, William Waldman, Bayonne Branch of the Division of Youth and Family Services, Drew Altman, Judge Stephen J. Schaeffer, Governor Thomas H. Kean and Judge Burrell Ives Humphreys.

A. Malicious Prosecution Based Upon a Prior Criminal Proceeding.
"It has generally been stated that malicious prosecution is not a favored cause of action because citizens should not be inhibited in instituting prosecution of those reasonably suspected of crime." Lind v. Schmid, 67 N.J. 255, 262, 337 A.2d 365 (1975). Where the action is brought, plaintiff bears a heavy burden:
A malicious prosecution action arising out of a criminal prosecution requires proof: (1) that the criminal action was instituted by the defendant against the plaintiff, (2) that it was actuated by malice, (3) that there was an absence of probable cause for the proceeding, and (4) that it was terminated favorably to the plaintiff. Prosser, Law of Torts, § 119 at 835 (4th ed. 1971); Evans v. Jersey Central Power, etc., Co., 119 N.J.L. 88 [194 A. 144] (E. & A. 1937) [Ibid.]
"The plaintiff must establish each element. Upon failure to prove any one, the cause must fail. Each element is separable from the others, although evidence of one may be relevant with respect to another." Ibid.
Plaintiff Adolph Delbridge on April 10, 1985, pled guilty to endangering the welfare of a minor in a criminal proceeding in Hudson County. As a guilty plea is equivalent to a conviction, it cannot be said that the outcome of the prosecution terminated favorably to plaintiff. Since plaintiff cannot establish the fourth element of malicious prosecution, it is not necessary to consider the other elements of malicious prosecution.
As plaintiff cannot establish one of the four essential elements of an action for malicious prosecution based upon a prior *359 criminal proceeding, namely, a favorable termination, any such allegation must fail.

B. Malicious Prosecution Based Upon a Prior Civil Proceeding.
The action for malicious prosecution of a civil suit is governed by the same rules governing such an action arising out of a criminal prosecution. Prosser, Torts, supra, § 97 at 885. Plaintiffs must establish each of the following elements in order to maintain an action for malicious prosecution based upon a prior civil proceeding: (1) the suit was brought without reasonable or probable cause, (2) it was actuated by malice, (3) it has terminated favorably to plaintiff, and (4) plaintiff suffered a special grievance. Shoemaker v. Shoemaker, 11 N.J. Super. 471, 78 A.2d 605 (App.Div. 1951).
Plaintiffs cannot establish that the action in question terminated favorably to them. The action or actions in question are the family court proceedings involving child abuse neglect actions and termination of parental rights acts. As plaintiffs state in their pleadings, the family court in Hudson County has removed plaintiffs' children from plaintiffs' custody. Plaintiffs do not dispute that the family court proceedings have not been terminated in their favor since that is the main reason they have brought these lawsuits.
As plaintiffs cannot establish that the civil suit terminated favorably to them, an action for malicious prosecution cannot be maintained.
Therefore, all allegations of malicious prosecution against defendants based upon either the criminal or civil proceedings are dismissed.

ASSUMING, ARGUENDO, THAT PLAINTIFFS COULD ESTABLISH AN UNDERLYING CONSTITUTIONAL DEPRIVATION, DEFENDANTS ARE STILL IMMUNE FROM SUIT UNDER 42 U.S.C.A. § 1983.
Although plaintiffs' allegations are difficult to decipher, it appears that plaintiffs are claiming certain defendants *360 acted with malice in committing constitutional violations against them. Plaintiffs have alleged that defendants, Division of Youth and Family Services, Bayonne BYFS Agency, Thomas Blatner, William Waldman, Adoption Resource Center, Joan Holleran Walsack, Eugene J. McCaffrey and the Department of Civil Service all acted with malice against them. The non-person defendants as stated perviously are immune from any 42 U.S.C.A. § 1983 action. As to the remaining individual defendants, in addition to the respondeat superior issue, plaintiffs have not established sufficient factual evidence of malice to overcome a good faith, qualified immunity necessary to prevail on a 42 U.S.C.A. § 1983 claim.
In enacting 42 U.S.C.A. § 1983, Congress did not intend to entirely withdraw the common law immunities available to government officials. Accordingly, a good faith qualified immunity was initially prescribed for the purpose of shielding state officials' conduct from liability. Scheuer v. Rhodes, supra, 416 U.S. at 244, 94 S.Ct. at 1690. However, this immunity, predicated upon a state official demonstrating that his actions were taken in subjective good faith and were not violative of any clearly established right, ultimately became a hollow protection because the element of subjective good faith did not "permit the defeat of insubstantial claims without resort to trial." Harlow v. Fitzgerald, supra, 457 U.S. at 813, 102 S.Ct. at 2736. The Harlow Court, therefore, amended that qualified immunity standard to provide insurance against "bare allegations of malice ... suffic[ing] to subject government officials either to the costs of trial or the burdens of broad-reaching discovery." Id. at 818, 102 S.Ct. at 2738. The new accommodation reached was stated as follows:
... government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. [Ibid.; emphasis supplied]
Recognizing the substantial costs imposed by the subjective good faith standard as there-to-fore applied when plaintiffs *361 alleged that government officials acted maliciously, the Court in Harlow adopted an objective good faith standard. Harlow v. Fitzgerald, supra, 457 U.S. at 814-817, 102 S.Ct. at 2736-38. The use of the objective standard permits disposition of claims on summary judgment motions despite allegations of malicious conduct. Ibid.
Subsequent developments in case law are traced in the New Jersey Supreme Court's opinion in Kirk v. City of Newark, 109 N.J. 173, 179-185, 536 A.2d 229 (1988). In Kirk, plaintiff filed a § 1983 action in which he alleged that a Newark police detective caused him to be arrested without probable cause. Id. at 176, 536 A.2d 229. The detective was assigned to investigate a charge of child abuse. She was presented with a Division of Youth and Family Services ("DYFS") report on the incident and the report of the treating physician. According to the DYFS caseworker and the doctor, the injuries were of "questionable origin." Id. at 176, 536 A.2d 229. The detective interviewed plaintiff, who lived with the mother of the child, who signed an exculpatory statement. The detective met with an assistant county prosecutor who advised that probable cause existed. The detective then filed a criminal complaint against plaintiff for aggravated assault. Plaintiff was arrested and held in the county jail for five days until he could post bail. Id. at 177, 536 A.2d 229. Thereafter, the detective spoke for the first time with the treating physician who advised that, consistent with plaintiff's version of the incident, the injuries appeared to be accidental. After the detective so advised the prosecutor's office, the criminal complaint was dismissed. Ibid.
It was against this factual background that our Supreme Court examined Malley v. Brigges, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) and Anderson v. Creighton, supra, and concluded that these cases reflect "the Court's commitment to the determination of Section 1983 actions on motion." 109 N.J. at 182, 536 A.2d 229; emphasis supplied. In Malley, plaintiffs filed a § 1983 action against a state trooper who allegedly caused them to be arrested without probable cause. *362 The Court adopted a test of objective reasonableness: a law enforcement officer "will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." Malley, supra, 475 U.S. at 341, 106 S.Ct. at 1096.
In Anderson v. Creighton, supra, plaintiff asserted a claim against an FBI agent who participated in a warrantless search of plaintiff's home for damages under the Fourth Amendment. The applicable standard is "whether a reasonable officer could have believed [the] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed." 107 S.Ct. at 3040. The officers' "subjective belief about the search are irrelevant." Ibid.; emphasis supplied. As articulated by the Court, the principles of qualified immunity permit an FBI agent "to argue that he is entitled to summary judgment on the ground that, in light of the clearly established principles governing warrantless searches, he could, as a matter of law, reasonably have believed that the search of the ... home was lawful." Ibid.; footnote omitted. Thus, a law enforcement official will prevail on summary judgment in a § 1983 action if he establishes either that "he or she acted with probable cause, or, even if probable cause did not exist, that a reasonable police officer could have believed in its existence." Kirk v. City of Newark, supra, 109 N.J. at 184, 536 A.2d 229, citing Anderson, supra, 107 S.Ct. at 3052, (Stevens, J., dissenting); emphasis supplied.
There is no question that defendants were acting within the scope of their employment. Plaintiffs have not alleged otherwise. Even though malice may be alleged generally, R. 4:5-8(a), plaintiffs cannot rely on bare assertions of malice to overcome the good faith immunity.
Our courts have not hesitated to dismiss lawsuits founded solely upon the bare allegation that a fact issue exists. Bilotti *363 v. Accurate Forming Corp., 39 N.J. 184, 193, 188 A.2d 24 (1963). Trial judges are not simply invited, but in fact duty-bound, to scrutinize the non-moving parties' submissions to determine whether they give rise to a "genuine" factual dispute.
This inquiry is no more circumscribed merely because opposing papers suggest that such a dispute pertains to the issue of a defendant's subjective state of mind. Our courts have embraced the opportunity to grant summary judgment notwithstanding the presence of potential issues related to subjective elements. The decision reached in Rothman v. Silber, 90 N.J. Super. 22, 216 A.2d 18 (App.Div. 1966), exemplifies this point, where the question pondered was whether a genuine issue of material fact existed to support a finding of medical malpractice. Upon observing that proof of fraudulent concealment was necessary to sustain such a claim, the court perused the record in pursuit of this evidence. Its determination on this fact-sensitive issue was as follows:
We are satisfied from our examination of plaintiff's affidavit and depositions referred to, that the trial judge properly determined that there was no evidence from which it could be inferred that any of the defendants had fraudulently concealed plaintiff's purported injury from her and that, therefore, there was no genuine issue of material fact as to that contention. [Id. at 35, 216 A.2d 18]
See also Rankin v. Sowinski, 119 N.J. Super. 393, 401, 291 A.2d 849 (App.Div. 1972) (summary judgment record did not support finding of fraudulent concealment); Trautwein v. Harbourt, 40 N.J. Super. 247, 123 A.2d 30 (App.Div. 1956) (affirmance of summary judgment decision for failure to find willful and malicious conduct on the part of defendants).
Further evidence of this lack of hesitancy in summarily dismissing lawsuits can be adduced by reference to the libel context wherein courts are routinely grappling with allegations that a defendant acted maliciously. In the context of subjective intent matters, such as these, our Supreme Court has made a special point of encouraging trial courts "to give particularly careful consideration to identifying appropriate causes for summary judgment disposition." Kotlikoff v. The Community *364 News, 89 N.J. 62, 67-68, 444 A.2d 1086 (1982); see Gomez v. Murdoch, 193 N.J. Super. 595, 602, 475 A.2d 622 (App.Div. 1984) (summary judgment granted because plaintiff "failed to raise any question of fact as to actual malice" and therefore could not overcome defendants' qualified privilege); Marchiano v. Sandman, 178 N.J. Super. 171, 176, 428 A.2d 541 (App.Div.), certif. den. 87 N.J. 392, 434 A.2d 1073 (1981) (test for actual malice not satisfied); Sokolay v. Edlin, 65 N.J. Super. 112, 126-127, 167 A.2d 211 (App.Div. 1961) (summary judgment granted where there was no finding of malice sufficient to create a genuine issue of material fact to defeat the defense of qualified privilege). The bare, unsubstantiated allegations of malice necessary to overcome the objective good faith standard for § 1983 actions mandates dismissal of plaintiffs' complaints against these defendants.

PLAINTIFF'S CLAIMS OF IMPROPER MEDICAL EXAMINATION AGAINST DEFENDANTS DYFS, ITS BAYONNE OFFICE, THE MEDICAL ASSISTANCE UNIT, THE ADOPTION RESOURCE CENTER AND DR. HANSON ARE BARRED BY THE NEW JERSEY TORT CLAIMS ACT.
Plaintiff, Adolph Delbridge, in various complaints, alleges he was improperly diagnosed and evaluated by Christian Hanson, M.D. and the Adoption Resource Center and that incorrect medical conclusions were drawn from those evaluations by the Division of Youth and Family Services, its Bayonne office, and the Medical Assistance Unit.
Such claims are subject to the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 et seq. That act was enacted in 1972 as the legislative response to the New Jersey Supreme Court's abrogation of sovereign immunity in Willis v. Department of Conservation & Economic Development, supra. Under the act, any liability is subject to any applicable immunity, in order to effectuate the Legislature's intent to re-establish, with specified *365 exceptions, sovereign immunity. See N.J.S.A. 59:2-1; Birchwood Lakes Colony Club v. Medford Lakes, 90 N.J. 582, 596, 449 A.2d 472 (1982) ("Immunity is the dominant consideration of the Act").
One of the specific immunities of the Tort Claims Act pertains to the "Failure to make physical or mental examination or to make adequate physical or mental examination." That section provides:
... Except for an examination or diagnosis for the purpose of treatment, neither a public entity nor a public employee is liable for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination, of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others.... [N.J.S.A. 59:6-4]
Here, plaintiff's claims that defendants failed to perform adequate or appropriate medical diagnoses or evaluations fall squarely within this immunity provision. Clearly, the examinations conducted by Dr. Hanson, a DYFS staffer, and The Adoption Resource Center, a DYFS agency, and the DYFS Medical Assistant Unit, were not "for the purpose of treatment." Consequently, while plaintiff may dispute the adequacy of those defendants' examinations, N.J.S.A. 59:6-4 shields them from liability. It follows, therefore, in accordance with N.J.S.A. 59:2-2 that since the DYFS physician and DYFS center are not liable for their evaluations, neither is the Division of Youth and Family Services itself.
This is particularly so in view of the Legislature's express cautioning against the acceptance of "novel causes of action" under the Tort Claims Act. As stated in the legislative comment to N.J.S.A. 59:2-1, in explanation of the overall purpose of the Tort Claims Act: "It is hoped that in utilizing this approach the courts will exercise restraint in the acceptance of novel causes of action against public entities." One could scarcely imagine more novel causes of actions against so many defendants than the ones plaintiffs are asserting here. The policy *366 and provisions of the Tort Claims Act, therefore, bar plaintiff's action for this claim.

DYFS, ITS BAYONNE OFFICE, THE MEDICAL ASSISTANCE UNIT, THE ADOPTION RESOURCE CENTER AND DR. HANSON OWED NO DUTY TO PLAINTIFF AND, THEREFORE, CANNOT BE LIABLE FOR PERFORMING INADEQUATE OR INAPPROPRIATE MEDICAL DIAGNOSES OR EVALUATIONS OF HIM.
There can be no tort liability where there is no duty of care owed to plaintiff. Prosser and Keeton, The Law of Torts (5 ed. 1984), § 53; Strachan v. John F. Kennedy Memorial Hosp., 209 N.J. Super. 300, 315-316, 507 A.2d 718 (App.Div. 1986).
None of the claimed diagnoses or evaluations of plaintiff was for the purpose of treatment of plaintiff, Adolph Delbridge; rather, they were for the purpose of giving information to the agencies for submission to the court. They certainly were not for the purpose of aiding plaintiff.
They owed no duty to plaintiff as their sole responsibility was to aid in determining the best interests of the children.

ABSOLUTE IMMUNITY IS AFFORDED TO THOSE PARTICIPATING IN JUDICIAL PROCEEDINGS.
DYFS, its Bayonne Office, the Medical Assistance Unit, The Adoption Resource Center and Dr. Hanson are protected by the absolute privilege which attaches to statements made in the course of a judicial proceeding.
The most noteworthy illustration of the absolute privilege or immunity is that afforded in judicial proceedings where judges, attorneys, witnesses, parties and jurors are fully protected against defamation actions based on utterances made in the course of the judicial proceedings and having some relation thereto. [Rainer's Dairies v. Raritan Valley Farms, Inc., 19 N.J. 552, 558, 117 A.2d 889 (1955)]
This absolute privilege attaches to reports and other communications prepared for submission to the court or during the *367 course of litigation. Middlesex Concrete, etc. v. Carteret Industrial Ass'n, 68 N.J. Super. 85, 92, 172 A.2d 22 (App.Div. 1961); DeVivo v. Ascher, 221 N.J. Super. 28, 35, 533 A.2d 412 (Law Div. 1987). The holder of the privilege is entitled to complete immunity regardless of allegations of malice or bad faith. Rainer's Dairies, supra, 19 N.J. at 558, 117 A.2d 889. Middlesex Concrete, supra, 68 N.J. Super. at 91, 172 A.2d 22.

CONCLUSION
Motion for summary judgment granted dismissing the complaints against defendants.
NOTES
[1] After the cases were consolidated, the venue was transferred to Essex County because these matters involve Hudson County judges and other officials. On December 16, 1988, the court granted plaintiffs leave to file amended complaints in five cases to add 37 additional defendants.
[2] The court has this day, in a separate opinion, 238 N.J. Super. 288, 569 A.2d 854 granted summary judgment in favor of the Office of the Public Defender, Law Guardian Program, the law guardian, and two lawyers appointed by the court to represent plaintiffs in the proceeding to terminate parental rights.
[3] This information was contained in articles printed in the Jersey Journal, presented by plaintiffs in opposition to this motion. It was also stated therein:

Their story stretches back two years. Jill and Adolph Delbridge began to experience problems in their relationship. Adolph drank too much and infuriated Jill with his comments about running off with another woman.
Jill feared that Adolph would leave her and take their five children. She says she coached her 4-year old daughter to say her father had done "fresh things" to her. Jill used a doll to illustrate what the girl should say.
"At the time I was under so much stress. I know I did a horrible thing but I never thought I would lose my entire family over this," Jill says. "The pressures built up, and then there was a big explosion."
Jill told her little girl to go along with the story so mommy and daddy wouldn't split up. Jill then telephoned the State's Division of Youth and Family Services. She says she regrets having made the charge.
....
On an attorney's advice, she went to the prosecutor's office to recant.
[4] This is to say nothing of the effect such a situation will have on the court's docket. The Legislature as recently as June 28, 1988, expressed itself on the issue of frivolous litigation by enacting N.J.S.A. 2A:15-59.1. This act allows relief to the prevailing party by the awarding of attorney's fees. Unfortunately, this remedy is meaningless when litigating with an indigent.
[5] Actually, there were 42 complaints since the complaint against Dr. Hamid Moussavian, alleging medical malpractice, was erroneously not consolidated.
[6] R. 5:3-3 authorizes Superior Court judges of the Family Part to order examination by a physician, psychiatrist, psychologist or other health or mental health professional designated by them.
[7] In addition, even under a theory of respondeat superior, Judges Schaeffer and Humphreys could not be liable if Judge Hornstein was not.
[8] N.J.S.A. 30:4C-11.